UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

JOHN SIMONLACAJ,

*Defendant.*

Case No. 16 Cr. 384 (VB)

# SENTENCING MEMORANDUM OF DEFENDANT JOHN SIMONLACAJ

Anirudh Bansal
Samantha Lawson
Katherine Lihn
Jacquelyn E. Ryberg
Cahill Gordon & Reindel LLP
Eighty Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for John Simonlacaj*

September 2, 2016

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

JOHN SIMONLACAJ'S PERSONAL HISTORY AND BACKGROUND.................................. 1

1.   Mr. Simonlacaj's Upbringing ................................................. 1

2.   Family ..................................................................... 2

3.   Employment ................................................................. 6

4.   Service to Others in His Community ......................................... 7

A NON-CUSTODIAL SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a) ............. 14

1.   A Custodial Sentence Would Cause Severe Harm to Mr. Simonlacaj's
        Family.................................................................. 15

2.   A Non-Custodial Sentence is Warranted by Mr. Simonlacaj's Extraordinary
        Generosity and Service to His Community................................ 17

3.   A Sentence of Probation Would Constitute Ample and Appropriate
        Punishment for Mr. Simonlacaj's Offense. .............................. 19

4.   A Sentence of Probation is Consistent with Sentences Imposed in
        Comparable Cases ...................................................... 20

CONCLUSION................................................................. 23

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Gall v. United States,*
    552 U.S. 38 (2007).................................................................................14, 19-20

*United States v. Collado,*
    No. 07 Cr. 1144, 2008 WL 2329275 (S.D.N.Y. June 5, 2008) ...............................14

*United States v. Coughlin,*
    No. 06-20005, 2008 U.S. Dist. LEXIS 11263 (W.D. Ark. Feb. 1, 2008)................20

*United States v. Floyd,*
    No. 10 Cr. 309 (S.D.N.Y. Apr. 2, 2013), ECF No. 90..........................................21

*United States v. Galante,*
    111 F.3d 1029 (2d Cir. 1997)........................................................................15, 17

*United States v. Gall,*
    374 F. Supp. 2d 758 (S.D. Iowa 2005) .........................................................19-20

*United States v. Greene,*
    249 F. Supp. 2d 262 (S.D.N.Y. 2003)............................................................21, 22

*United States v. Gupta,*
    904 F. Supp. 2d 349 (S.D.N.Y. 2012)...............................................................14

*United States v. Holzer,*
    No. 09 Cr. 470 (S.D.N.Y. Sept 29, 2009) ........................................................17-18

*United States v. Homann,*
    No. 09 Cr. 724 (D.N.J. Jan 6, 2010), ECF No. 9 ..............................................21-22

*United States v. Libous,*
    No. 14 Cr. 448 (S.D.N.Y. May 18, 2015).........................................13-14, 21-22

*United States v. Londono,*
    76 F.3d 33 (2d Cir. 1996)................................................................................15

*United States v. Mal,*
    942 F.2d 682, 687 (9th Cir. 1991) ...................................................................13n

*United States v. Milikowsky,*
    65 F.3d 4 (2d Cir. 1995)..................................................................................17n

*United States v. Olenicoff,*
    No. 07 Cr. 227 (C.D. Cal. Apr. 16, 2008), ECF No. 18 .......................................21

*United States* v. *Peterson*,
No. 11 Cr. 665 (S.D.N.Y. Oct. 11, 2011) ........................................................18, 19

*United States* v. *Roberts*,
No. 01 Cr. 410 (RWS), 2005 WL 1153757 (S.D.N.Y. May 16, 2005) ...................15

*United States* v. *Serafini*,
233 F.3d 758 (3d Cir. 2000)...................................................................................18

*United States* v. *Shokler*,
No. 12 Cr. 415, 2013 WL 4851695 (E.D.N.Y. Sept. 10, 2013) ............................21

*United States* v. *Toback*,
No. 01 Cr. 410 (RWS), 2005 WL 992004 (S.D.N.Y. Apr. 14, 2005) ...................17n

*United States* v. *Villella*,
No. 07 Cr. 287-02 (RWS), 2007 WL 2845290 (S.D.N.Y. Sept. 25, 2007) ............21

*United States* v. *Warner*,
792 F.3d 847 (7th Cir. 2015) ................................................................................21

**Statutes/Sentencing Guidelines**

18 U.S.C. § 3553(a) ........................................................................................ *passim*

26 U.S.C. § 7206(2) .................................................................................................1

U.S.S.G. § 2T1.4(a)(1)..........................................................................................13n

**Other Authorities**

United States Sentencing Commission, *Measuring Recidivism: The Criminal History
Computation of the Federal Sentencing Guidelines*12, 28 (2004), *available at*
http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-
publications/2004/200405_Recidivism_Criminal_History.pdf. ...........................20n

Lynnley Browning, *New Jersey Businessman, a UBS Client, Pleads Guilty to Tax Evasion*, N.Y.
Times, Sept. 25, 2009, *available at*
http://www.nytimes.com/2009/09/26/business/26ubs.html?...................................21

## PRELIMINARY STATEMENT

On June 3, 2016, John Simonlacaj pled guilty to a one-count Information charging him with causing the filing of a false 2010 Federal income tax return, in violation of Title 26, United States Code, Section 7206(2). Mr. Simonlacaj will be sentenced by the Court on September 16, 2016. While the application of the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") to the offense yields a non-binding calculation of 12-18 months' imprisonment (based primarily on the approximately $132,000 in tax loss involved), for the reasons discussed below, we respectfully concur with the conclusion of the Probation Office that a term of imprisonment is not necessary to satisfy the objectives of sentencing.

As discussed more fully below, and in the over 20 letters submitted to the Court by members of his community and family, Mr. Simonlacaj's offense must be viewed against the backdrop of a life of extraordinary charity, devotion to family and community, and hard, honest work. As he will express to the Court in his own words at sentencing, Mr. Simonlacaj is deeply remorseful for his offense, and he has made restitution in full, in an amount *substantially greater* than the tax loss calculated in the Plea Agreement. As the Probation Office notes, imprisonment is not necessary to the objectives of punishment and individual deterrence, and would cause substantial hardship to Mr. Simonlacaj's wife and three children, ages 5, 13, and 18. A sentence of probation would also be entirely consistent with a long line of precedents in comparable cases before this and other Courts. Accordingly, we respectfully request that the Court follow the recommendation of the Probation Office and sentence Mr. Simonlacaj to a term of probation.

## JOHN SIMONLACAJ'S PERSONAL HISTORY AND BACKGROUND

### 1. Mr. Simonlacaj's Upbringing

John Simonlacaj's parents, Simon and Sante Simonlacaj, immigrated to the United States from the former Yugoslavia in 1967 to escape ethnic oppression. Mr. Simonlacaj's parents

-1-

settled in Brooklyn, New York, where they had four children – Mr. Simonlacaj (now 46 years old) and his sisters Lisa (age 47), Victoria (age 40), and Rita (age 37).

Before the Simonlacaj family moved to Westchester in 1985 (when Mr. Simonlacaj was 17), Mr. Simonlacaj and his sisters were raised in Brooklyn, the Bronx, and later Washington Heights. The family lived very modestly during Mr. Simonlacaj's early years. Mr. Simonlacaj recalls his mother collecting discarded furniture from the sidewalk to furnish their home. Mr. Simonlacaj's parents instilled in him and his sisters the value of hard work and the importance of helping others. Mr. Simonlacaj took these lessons to heart, and has held jobs since he was 15 years old. Mr. Simonlacaj never considered any honest work too menial, and as a full-time student in high school and college, he worked full-time on weekends and part-time on weekdays in jobs ██████████████████████████████████████████████ Mr. Simonlacaj has been employed full-time for the last 22 years since graduating college.[1]

### 2. Family

Mr. Simonlacaj met Drita Lulgjuraj at a wedding in 1993. The two fell in love and were married on August 4, 1994, when Mr. Simonlacaj was 25 years old and Drita was 18 years old. They recently celebrated their twenty-second wedding anniversary, and have three children, ████(age 5), ████ (age 13), and ████ (age 18). Mr. Simonlacaj is at the center of his nuclear and extended family, who depend on him completely. Drita Simonlacaj describes her husband as "a kind hearted, caring, giving and good hearted man," who is "the center" of her life and their children's lives. (Letter of Drita Simonlacaj, dated June 18, 2016 (attached hereto as Exhibit 1) at 1, 3). Drita notes that Mr. Simonlacaj is a "very involved and wonderful father" who, despite

---

[1]    Further details on Mr. Simonlacaj's full-time employment as an adult are provided *infra* at 6-7.

"long hours and heavy responsibilities at work . . . always manages to find time for [their] children." (*Id.* at 1).

The Simonlacajs' youngest daughter ████ just five years old, is particularly dependent on her father from an emotional standpoint. Drita writes that "[t]o say that ████ is a Daddy's girl is an understatement." (*Id.* at 2). ████ refuses to go to sleep until her father has read her a bedtime story, and only he may call her ████ a nickname based on her middle name. ████ is the first to greet Mr. Simonlacaj at the door when he returns home from work, and she wakes up early with him every Sunday morning to help prepare breakfast for the family before church. (*Id.*).

Mr. Simonlacaj also dotes on his 13 year old daughter ████ an aspiring singer. However, Drita notes that "[i]t has been a struggle with ████ the last few years to say the least. I need her father to help guide her . . . [as] ████ doesn't take school work too seriously." (*Id.* at 2). At 13 years old, ████ is very attached to her father, and is at an age and a stage in life when she very much needs both of her parents. Drita writes that ████ "responds to him [Mr. Simonlacaj] better than me, as he is more patient than I am. . . . He has a calming way of getting through to her, and she responds in a positive way to him." (*Id.*). Drita further notes that Mr. Simonlacaj makes all of his children's school work a priority and "helps the kids with homework and always pushes them to do better." (*Id.* at 1).

Mr. Simonlacaj's son ████ who just turned 18 years old, is an accomplished high school athlete, and his strong bond with his father revolves around their mutual love of sports. Drita notes that Mr. Simonlacaj has spent "endless hours[,] the two of them practicing in the backyard" and that Mr. Simonlacaj never misses ████ games. (*Id.* at 1). Regardless of his work

obligations, Mr. Simonlacaj would "always be in the stands cheering ██ on, leaving work early to make sure he didn't miss a game." (*Id.*).

Drita continues that ██ "worked very hard in high school and got really good grades throughout." (*Id.* at 2). ███████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████ is looking forward very much to college, but if Mr. Simonlacaj is incarcerated and loses his job,[2] he will be unable to afford four years of tuition at a private college. As Drita writes:

> John is our sole provider. I don't know what I would do. My son's life will be compromised. You can imagine how proud we are of ██████ accomplishments. I can't imagine telling him that he can't go. He is relying on his father to support him financially so that he can go to the school that he has worked so hard throughout the years to attend.

(*Id.* at 2).

Mr. Simonlacaj's strong devotion to Drita and their children is evident to everyone who knows him. Mr. Simonlacaj's sister Lisa Nrekaj writes:

> His own children are the true center of his life. John's entire face lights up when one of his children enter[s] the room. The same is true when he comes home to his children each evening. His daughters[ ] run up to him as if he had been gone for a week instead a few hours. His son is John's shadow. John makes sure to spend quality time with each of his children. . . . His love and devotion to his 3 children is the most important thing about John.

(Letter of Lisa Nrekaj, not dated (attached hereto as Exhibit 2) at 2). Mr. Simonlacaj's good friend, ████████████████ Timothy O'Connell, echoes that, in a life with much to be proud of, "John's greatest and most cherished accomplishment to date is the

---

[2] As discussed below, Mr. Simonlacaj will lose his job if incarcerated, but will be able to keep it if his employment is not interrupted by a prison sentence.

relationship he shares with his wife Drita and their commitment to ███████████████" (Letter of Timothy O'Connell, dated July 6, 2016 (attached hereto as Exhibit 3) at 1).

In her letter to the Court, Mr. Simonlacaj's wife Drita describes in stark terms the impact a sentence of incarceration would have on her children:

> Your Honor, my children will be greatly affected by not having their father in their lives. They are so close and rely so heavily on him. I am concerned for my daughter's well being because they are so young and won't understand. . . . The emotional pain that they will feel is disheartening. Your Honor, I am scared. I am scared that if John is incarcerated, this will be a great disturbance in my children's lives and will affect and hurt them so deeply.

(Letter of Drita Simonlacaj, (Ex. 1) at 2).

Mr. Simonlacaj's absence would also take a heavy toll on his extended family, in particular his elderly parents. Ms. Nrekaj writes, "[w]hen my brother married, he continued to live at home because he would not leave our parents alone. He knew that they would need his help. My brother has established himself [] as the head of our family." (Letter of Lisa Nrekaj, (Ex. 2) at 1). Mr. Simonlacaj's role as the center of the extended family has become more pronounced as ███████████████████ Mr. Simonlacaj's mother is 72 years old ██████████████████████" and Mr. Simonlacaj's father is 75 years old and ███████████ (Letter of Drita Simonlacaj, (Ex. 1) at 2). Mr. Simonlacaj's parents, who own and operate two residential apartment buildings in the Bronx, are no longer able to manage the business on their own, and Ms. Nrekaj notes that Mr. Simonlacaj now "works full time and runs my parents' business." (Letter of Lisa Nrekaj, (Ex. 2) at 1). Drita adds that Mr. Simonlacaj "refuses to take a dime" for this. (Letter of Drita Simonlacaj, (Ex. 1) at 3). She also notes that Mr. Simonlacaj's parents have two employees that rely on Mr. Simonlacaj's management of the business. (*See id.*).

Mr. Simonlacaj's parents rely on him for much more than running their business. Mr. Simonlacaj accompanies his parents and guides them through ████████████ and errands, and it would be difficult for them, ████████████████ to manage these matters without him. (*See id.*). Ms. Nrekaj writes, "[m]y parents both need ████████████ ████████████. The language barrier and understanding of their medical needs is where John is needed so desperately. . . . If John is sent away my parents will be greatly affected." (Letter of Lisa Nrekaj, (Ex. 2) at 2).

   3.   *Employment*

After graduating from Iona College in 1996, Mr. Simonlacaj applied for and accepted a job at ████████████████████████████████████████████ ████████████████████. Mr. Simonlacaj has been employed full-time in the ███ ████████████████████ for the past 22 years. In 2005, he left ████████ ████████████████████████████████████ which was started by his former supervisor at ████████████████ Nir Meir. Of Mr. Simonlacaj's work ethic, Mr. Meir writes:

> I would describe him as a hardworking and talented ████████████
> ████████████████████ who, above all else, has shown himself to be a person
> of strong character, honesty and integrity. He has always been forthright with me
> and my partner and has a reputation for being fair and honest within the industry.

(Letter of Nir Meir, dated Apr. 19, 2016 (attached hereto as Exhibit 4) at 1).

Mr. Simonlacaj has advanced to the role of ████████████████████████████ ████, and has become indispensable to the company. Mr. Meir notes that "John is critical to the success of our organization. To lose him would be catastrophic to our company and its projects." (*Id.* at 1). Nevertheless, due to the client-facing nature of Mr. Simonlacaj's job, ████ has informed him that, while they have supported him through his guilty plea and would keep him on

-6-

if his work continued uninterrupted, if his work were interrupted by a prison sentence they would have to terminate him and could not hire him back. It is also extremely unlikely that another firm in the industry would hire Mr. Simonlacaj after he lost his job at ███ and served a prison term.

Accordingly, a sentence of incarceration would permanently impact Mr. Simonlacaj's ability to support his family. Drita elaborates:

> Your Honor, if you send my husband away, all that he has worked so hard for his entire adult life will be gone. I was fortunate enough to be able to stay at home and raise our children. John has supported us financially as my role has always been the stay at home wife and mother. This situation has taken such a toll on our lives. My husband and I stay up every night for hours at a time, talking about what has occurred and how a mistake has compromised our lives emotionally and financially.

(Letter of Drita Simonlacaj, (Ex. 1) at 3).

### 4. Service to Others in His Community

Mr. Simonlacaj is aware of his good fortune at having been raised by two hard-working and supportive parents who did everything in their power to help him make his place in the world. He has tried to pay this good fortune forward by reaching out to those less fortunate than him. Drita writes that "John always gave people a chance. The number of people he has helped by providing them with jobs is countless. . . . These people contacted him because of his reputation in helping so many others in need for work." (Letter of Drita Simonlacaj, (Ex. 1) at 3). Drita continues that "John's parents, and myself are constantly approached by people in our community saying wonderful things about him and thanking us for the help and jobs that he has given to so many in need." (*Id.*). The Reverend Peter A. Popovich, ███████████████ ███████████ in Hartsdale, New York, elaborates that "John was able to find employment for over fifty newly arrived immigrants that were having a hard time sourcing work due to their

language barrier." (Letter of Rev. Peter A. Popovich, dated Aug. 3, 2016 (attached hereto as Exhibit 5) at 1).

Many of those Mr. Simonlacaj has helped have provided the Court with first-hand accounts of his generosity. For example, Skender Marku writes that after he moved to the United States to find "a better life" for his family:

> John gave me a chance to become ███████████ ████████. He gave me two bedroom apartment because I have two children. I did not pay rent and [I] could start to save money. Now I am ██████████ ████████████████████ and my daughter is going to ████████████ ████████. First in my family I asked John to be God father to my children because I know that he would take care of my children like his own if anything happen to me and my wife. I owe John my life in the United [S]tates and he is for me the best man I know here. He gave me a chance and saved my life. For me is God in heaven and John on earth.

(Letter of Skender Marku, dated June 26, 2016 (attached hereto as Exhibit 6) at 1).

Ndoke Prebibaj similarly recounts that he met Mr. Simonlacaj after coming to the United States from Albania in 1999, "[h]oping to provide a better future for [his children and] wife." Mr. Prebibaj writes:

> Imagine coming to the United States from an undeveloped country without knowing how to speak or having a job or knowing how to provide for your family. . . . As luck would have it [I was] introduced . . . [to] Gjon Simon lacaj, a blessed person and his family. . . . I started work all thinks to Gjon Simoni. He was an answer to all my prayers he gave me hope and the ability to provide for my family. He was not only a prayer answer to me but to many other families father's just like me he gave the opportunity and ability to provide for their family. I was ████████████████████████████████████ ████████████████████. . . . Whoever went to him or was addressed to him that needed help to find a job he was always there to help with pleasure. . . . For as long as I live I'm forever grateful to him and his wonderful family.

(Letter of Ndoke Prebibaj, dated June 26, 2016 (attached hereto as Exhibit 7) at 1).

Pal Kapaj, who immigrated to the U.S. in 1996, writes:

> If it wasn't for John Simonlacaj and his incredible generosity to help a fellow brother I would not be here today to tell you my story. I came to this country with . . . a hope that [I] would get to live the [A]merican dream. When [I] came [I]

was surprised at how expensive it costs to live here . . . [and] I was getting worried that I would run out of money and would make me return to Albania. . . . Then one day when I was talking with friends someone said John's name. . . . He said that John helped someone that was like me in my situation. . . . I was able to send John a message asking him if I could meet him for a cup of coffee. . . . He sat quietly and patiently for 45 minutes while I told him my situation. . . . John called me . . . and went out of his way to help a complete stranger. He didn't have to do it but he made it his business to help a person in need. A rare thing these days. ███████████████ ████████████████████. John made it possible for me to start a family here and live the [A]merican dream. I owe everything to him and not a day goes by that I don't wake up and think how lucky I am that I crossed paths with such a wonderful and caring person named John Simonlacaj.

(Letter of Pal Kapaj, dated July 24, 2016 (attached hereto as Exhibit 8) at 1).

Marel Ujka, who moved from Albania to the United States and met Mr. Simonlacaj in 2002 while doing a small repair job in lower Manhattan, writes:

Times were very tough for a young, not well spoken immigrant as I was. . . . Many times since I came in this country I have asked God for help, an opportunity in life, I was not expecting that he would make me cross paths with John, and forever change my fate, and that of my family. He gave me the biggest opportunity that I would ever get in my life, a chance to work alongside larger companies and build a reputation for myself. John that day opened up a door that would have been impossible to find never mind going through it. As years went by I would meet people, and learn about the generosity that John has in him. For what I have seen and mostly heard, is that John Simonlacaj has helped dozen and dozen of people that were waiting for a change in their life, a turn for the better or just in plain English a God Send when times are very tough. I really wish that we had more people like John around, people like him that help unconditionally. Meeting John had a big impact in my life, and the opportunity given by him to work along ████████████ has been and still is a privilege that a treasure each day.

(Letter of Marel Ujka, dated Aug. 3, 2016 (attached hereto as Exhibit 9) at 1).

Mr. Simonlacaj is often the person members of his community turn to during the most challenging times in their lives. Patrik Solotruk, Mr. Simonlacaj's close friend of 25 years writes:

Just recently, I lost a position during a time in which I had a pregnant wife and sizable mortgage. It was the toughest time of my life. I went to John for advice and assistance. Like a true friend, he shared my burden. After some time, he helped me obtain an opportunity with a reputable company. Four years later, my

family and I are enjoying sustenance and solace thanks to the unselfish and
supportive efforts of John.

(Letter of Patrik Solotruk, dated Aug. 4, 2016 (attached hereto as Exhibit 10) at 1).

Mr. Simonlacaj's friend of 35 years, Nick Vataj, similarly recalls that Mr. Simonlacaj

supported him "in the most difficult times of [his] life, when █████████████████████

█████████████" (Letter of Nick Vataj, dated June 15, 2016 (attached hereto as Exhibit 11) at

1). Mr. Vataj remembers that Mr. Simonlacaj and Drita checked in with him almost daily to see

if they could do anything to help:

> [John] and his wife would bring dinner over when █████████████████████
> he would call almost daily to check if we needed anything. He would take my
> kids to dinner or a movie with his kids and the list goes on and on.

(*Id.*). Mr. Vataj writes of Mr. Simonlacaj, "I can't tell you enough on how much I rely on him. I

truly love him like a brother and words can't express how I feel about him. He is kind and

caring and a good family man." (*Id.*).

Samuel Votta, another close friend, recalls that when █████████████████████

█████, Mr. Simonlacaj drove Mr. Votta's wife █████████████, brought meals to the

family, and took care of chores that would have been difficult for the Vottas to accomplish. Mr.

Votta writes:

> I will never forget how he dropped everything for a friend in need. He and his
> wife and whole family are wonderful, caring, genuine human beings. I will never
> forget his support and prayers, it comforted me greatly and █████████████.

(Letter of Samuel Votta, dated June 15, 2016 (attached hereto as Exhibit 12) at 1).

Norma Zagreda, a friend of Mr. Simonlacaj and his wife for nearly 15 years, shares a

similar story:

> Two years ago my █████████████████████████████████
> █████████████████████ Our family was
> inconsolable. John knew leaving the house was difficult so he invited us over to
> his home where we could bring our kids. John's wife prepared a home cooked

meal and John entertained us all with hours of karaoke, John at the mic. John has made this a tradition, continuing to open his home to us and our children to replace the sadness with happy memories.

(Letter of Norma Zagreda, dated Aug. 2, 2016 (attached hereto as Exhibit 13) at 1).

The accounts of Mr. Simonlacaj's compassion and generosity continue in the many letters written by friends, family, and acquaintances. Laurie Golub, a friend and co-worker, recalls that when ███████████████████ Mr. Simonlacaj immediately reached out to her and brought food for the guests at the Shiva. Ms. Golub states, "I can't tell you how much this meant to me and my family." (Letter of Laurie Golub, dated July 18, 2016 (attached hereto as Exhibit 14) at 1). ████████ O'Connell recounts that after the ████████████████████, his son began to lose interest in school and lash out. The ████████ remembers how, during that time, "John's mentorship [of his son] was truly a gift and provided him the foundation for optimism and success that he was struggling to find at a critical point in his life." (Letter of Timothy O'Connell, (Ex. 3) at 1).

Mr. Simonlacaj's support of charitable causes in his community spans decades and began when he was a teenager. Mr. Simonlacaj was raised in a deeply religious family and has been involved in his community church all of his life. When Mr. Simonlacaj was 17 years old, he, his father, and his uncle dedicated their time and labor to build a new church for their community in Hartsdale, New York. Mr. Simonlacaj has remained a generous contributor to the church community ever since. Reverend Popovich writes, "Over the years I have seen this young boy turn into a good man. . . . [P]eople always say good things about his examples, his commitments, his faith, family and friends." (Letter of Rev. Peter A. Popovich, (Ex. 5) at 1).

In their letters, Caity Connolly, a representative of ████████████████████, and Helene Feldman, the chairperson of a charity that supports medical care in Israel, discussed Mr. Simonlacaj's tireless support of their charitable causes. (*See* Letter of Caity Connolly, not

-11-

dated (attached hereto as Exhibit 15) at 1; Letter of Helene Feldman, dated June 22, 2016

(attached hereto as Exhibit 16) at 1). Mr. Simonlacaj has also instilled in his children the

importance of giving back to the community. Ms. Feldman has spent time with Mr.

Simonlacaj's children over the past decade at charity events and notes that Mr. Simonlacaj "has

taught [his children] about the importance of doing charity work and 'giving back' and is a great

role model in this regard." (Letter of Helene Feldman, (Ex. 16) at 1). Drita elaborates:

> Every year around Thanksgiving, he packs up the kids in his pick-up and takes a
> ride to Sam's club to buy several cases of soups and prepackaged food for the less
> fortunate. The kids load up the truck and drive to our nearby church to deliver the
> food. He has the kids unload the food once they get there, so that they can feel
> that they helped. The feedback that I get from the kids after this experience is
> amazing! ███ comes home and tells me how happy she is that someone could eat
> because of her.

(Letter of Drita Simonlacaj, (Ex. 1) at 1). Drita similarly describes Mr. Simonlacaj's actions

when he befriended a less fortunate family in upstate New York. When Mr. Simonlacaj learned

that the family had eight children, he "packed up the kids and head[ed] over to Walmart to buy

some things that he thought would help this family, such as thermal under shirts and pants,

socks, and t shirts in different sizes. This became a yearly ritual for John and the kids." (*Id.*).

OFFENSE CONDUCT AND RESTITUTION

The offense conduct is accurately stated in the PSR. As a result of Mr. Simonlacaj

falsely overstating Cortlandt's business expenses, and causing the false underreporting of its net

profit on the Schedule C to Rita Radoina's 2010 Federal tax return, the Internal Revenue Service

("IRS") suffered a tax loss estimated by the Government at approximately $132,000. (PSR, ¶

10). Mr. Simonlacaj regrets every day his decision to provide his accountant with false

information that he knew would be included in Ms. Radoina's 2010 tax return. He regrets the

harm his offense caused, and the precarious position in which he has placed his family. As

indicated, he will express his remorse to the Court personally at sentencing.

Mr. Simonlacaj has made full restitution, in an amount substantially *higher* than the Government's estimated tax loss. First, while it was not required by his plea agreement, Mr. Simonlacaj filed an amended Federal income tax return for 2010 with the help of a highly-regarded tax accountant. In the amended return, because Mr. Simonlacaj was the beneficiary of Cortlandt's 2010 income from the New York Power Authority project, he claimed this income,[3] and took only proper deductions. Taking this approach resulted in $147,850 in additional tax payments – over $15,000 higher than the calculated tax loss.[4] Mr. Simonlacaj has also paid an additional $27,442 in interest and $36,963 in late payment penalties,[5] resulting in a total payment to the IRS of $212,255.

In addition, without receiving any inquiry from state authorities, Mr. Simonlacaj filed an amended New York State tax return for 2010, and paid the State Department of Taxation and Finance $39,205 in additional tax, and a total of $29,277 in interest and late payment penalties, as well as an additional $2,480 in metropolitan commuter transportation mobility tax and associated interest and late payment penalties. In all, Mr. Simonlacaj has paid $283,217 in additional taxes, interest, and penalties in an effort to make the Federal and state governments whole – over *twice* the Government's estimation of tax loss. *See United States* v. *Libous*, No. 14

---

[3] We understand that the accountant is assisting Ms. Radoina in filing an amended return for 2010, which will reflect that she was not the ultimate beneficiary of Cortlandt's income, so the income is not claimed twice.

[4] The difference is primarily attributable to the difference between the single-filer tax rate, which the Government appears to have used in its estimate, and the higher, married joint return rate, which Mr. Simonlacaj used.

[5] The government has correctly omitted penalties and interest from their tax loss calculation pursuant to U.S.S.G. § 2T1.1, Commentary, Application Note 1, ("The tax loss does not include interest or penalties, except in willful evasion of payment cases under 26 U.S.C. § 7201 and willful failure to pay cases under 26 U.S.C. § 7203"); *see also United States* v. *Mal*, 942 F.2d 682, 687 (9th Cir. 1991) (noting "[e]vasion of payment . . . generally involves conduct designed to place assets beyond the government's reach after a tax liability has been assessed").

Cr. 448 (S.D.N.Y. May 18, 2015) (VB), Sentencing Transcript (attached hereto as Exhibit 17) at 31, 33) (noting the importance of restitution in a tax fraud case).

<u>A NON-CUSTODIAL SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(a)</u>

Title 18, United States Code, Section 3553(a) makes clear that the Sentencing Guidelines range is only one of many factors the Court is required to consider in imposing sentence.[6] *See also United States* v. *Collado*, No. 07 Cr. 1144, 2008 WL 2329275, at *3 (S.D.N.Y. June 5, 2008). As one court in this District has put it, the Sentencing Guidelines "take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence." *United States* v. *Gupta*, 904 F. Supp. 2d 349, 354-55 (S.D.N.Y. 2012). Notably, Section 3553(a) also requires that the sentence be "sufficient, but not greater than necessary," to achieve the goals of sentencing. Accordingly, as the Supreme Court has noted, "[18 U.S.C.] § 3553(a)(3) directs the judge to consider sentences other than imprisonment." *Gall* v. *United States*, 552 U.S. 38, 59 (2007).

Here, the considerations set forth in Section 3553(a) strongly support the Probation Office's determination that a sentence of imprisonment is not necessary to accomplish the objectives of sentencing, and that "a sentence of probation is appropriate in this case." PSR, Sentencing Recommendation at 18. As discussed below, a non-custodial sentence would avoid

---

[6]     In addition to considering the Guidelines recommendation, 18 U.S.C. § 3553(a) states in relevant part: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;
(2) The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant . . .
(3) The kinds of sentences available . . .
(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) The need to provide restitution to any victims of the offense."

profound and irreversible harm to Mr. Simonlacaj's family, including his minor children, and would properly take into account his lifetime of generosity toward others and his community. A sentence of probation is also consistent with sentences imposed for comparable tax fraud offenses involving similarly-situated defendants.

      *1.    A Custodial Sentence Would Cause Severe Harm to Mr. Simonlacaj's Family.*

      Section 3553(a)(1) requires the sentencing Court to consider the "history and characteristics of the defendant," which naturally include his family circumstances, and courts in this District have frequently imposed non-custodial sentences where severe consequences to the defendant's family would result from imprisonment. *See United States* v. *Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) (upholding a sentence of time served – 8 days' imprisonment – where the defendant was the primary bread-winner for the family, and "removal of the father from this unit at this particular point in time would have a disastrous effect on the children in terms of possibilities of their education and upbringing") (internal quotation marks omitted); *United States* v. *Londono*, 76 F.3d 33, 36 (2d Cir. 1996) ("[T]his Court and other courts of appeals have recognized that a defendant's familial responsibilities may present such 'extraordinary circumstances' that a downward departure[7] in sentencing is necessary and permissible."); *United States* v. *Roberts*, No. 01 CR 410 (RWS), 2005 WL 1153757, at *5 (S.D.N.Y. May 16, 2005) (considering family obligations, among other factors, in imposing a sentence of time served).

      Here, a custodial sentence would be disastrous both emotionally and financially to Mr. Simonlacaj's children, ███ (age 5), ███ (age 13), and ███ (age 18), and his wife Drita. As discussed in the many letters submitted to the Court, and as detailed above, ███ ███ and ███ are heavily reliant on their father's presence in their lives from an emotional and developmental

---

[7]    For the sake of clarity, we do not believe that the Court needs to consider a downward departure under Chapter 5, Part K of the Sentencing Guidelines to impose a sentence of probation.

-15-

standpoint. ██ is only five years old and will likely be unable to even process Mr. Simonlacaj's prolonged absence, and ██ and ██ are at ages where their father's involvement is critical to their development.

Mr. Simonlacaj's sister Ms. Nrekaj writes that Mr. Simonlacaj is the "rock" anchoring his young children's lives. (Letter of Lisa Nrekaj, (Ex. 2) at 2). She elaborates that "[t]hey will not understand his absence, since he is their champion, their support, and their biggest fan." (*Id.*). Mr. Simonlacaj's son ██ "is on the verge of becoming his own man and needs his father's guidance and support through this transitional time. ██ is 13 and temperamental, as teenagers can be. John is her rock during those times. He is able to speak with her in such a calm way that she responds to him." (*Id.*). And at "just 5 years old . . . ██ is the baby . . . [s]he adores her father and would be devastated if he is not in her life." (*Id.*). Drita Simonlacaj elaborates, "██ is a very sensitive young girl. . . . When John works later hours, both of my girls are asking 'where's dad?' If John goes away I can't fathom the thought of breaking their hearts when they ask where he is." (Letter of Drita Simonlacaj, (Ex. 1) at 2).

Mr. Simonlacaj's parents will also suffer significant hardship if he is incarcerated. As Mr. Simonlacaj's sister Ms. Nrekaj recounts, Mr. Simonlacaj continued to live with his parents after he and Drita married so that he could care for them as they grew older. (Letter of Lisa Nrekaj, (Ex. 2) at 1). As a result, Mr. Simonlacaj's parents rely on him extensively for the management of their day-to-day lives, including their appointments and errands. (*Id.*). It is of particular significance that Mr. Simonlacaj's parents are elderly and ██████████ ████████████ in which Mr. Simonlacaj has become integrally involved. (*Id.*). As Ms. Nrekaj points out, "[m]y parents both ████████████ ████. The language barrier and understanding of their medical needs is where John is needed

-16-

so desperately. . . . If John is sent away my parents will be greatly affected." (Letter of Lisa Nrekaj, (Ex. 2) at 2).

The economic impact of a custodial sentence on Mr. Simonlacaj's wife and children will also be severe, since he has always been their sole provider. The financial harm Mr. Simonlacaj and his family face here is much more than the suspension of his income while he serves a prison term. Rather, any period of incarceration will result in the loss of his position at ███ and, likely, the inability to return to the real estate industry. One particularly stark and immediate consequence would be the limitation of the educational options available to ███ It is clear that Mr. Simonlacaj's incarceration would have a "disastrous effect on [his] children in terms of possibilities of their education and upbringing," warranting a sentence of probation. *Galante*, 111 F.3d at 1035 (internal quotation marks omitted) (approving non-custodial sentence where the defendant's wife had "limited earning capacity" and a custodial sentence would have put the family in a precarious financial position). [8]

2. *A Non-Custodial Sentence is Warranted by Mr. Simonlacaj's Extraordinary Generosity and Service to His Community.*

Because of the significance placed on a defendant's character under Section 3553(a), Courts in this District have recognized that a defendant's extraordinary generosity toward others may support a non-custodial sentence. For example, in *United States* v. *Holzer*, Judge Marrero

---

[8]    As discussed above, Mr. Simonlacaj's incarceration will also be extremely disruptive to the business of his employer, and to his parents' property management business. The Second Circuit has approved below-Guidelines sentences where "[the defendant] is the only individual with the knowledge, skill, experience and relationships to run [a business]" and employees would suffer as a result of defendant's incarceration. *United States* v. *Milikowsky*, 65 F.3d 4, 8 (2d Cir. 1995); *see also United States* v. *Toback*, No. 01 Cr. 410 (RWS), 2005 WL 992004, at *6 (S.D.N.Y. Apr. 14, 2005) (considering, under Section 3553(a), the fact that defendant was "essential to the successful operations of [his business]" in imposing a sentence of probation).

relied on the defendant's "commendable community service" in imposing a probationary sentence in a securities fraud case, where, as here, the defendant's offense level was 13, his Criminal History Category was I, and the Sentencing Guidelines called for 12-18 months' imprisonment. *See United State* v. *Holzer*, No. 09 Cr. 470 (S.D.N.Y. Sept. 29, 2009), Sentencing Transcript (attached hereto as Exhibit 18) at 17-18. Judge Marrero agreed with the Probation Office's assessment that the defendant's "life outside of this case demonstrates that he is a good person who made a terrible mistake." *Id.* at 17.

Similarly, in *United States* v. *Peterson*, Judge Patterson imposed a sentence of two years' probation and home confinement in a securities fraud case where the defendant also faced a Guidelines range of 12 to 18 months' imprisonment. *See United States* v. *Peterson*, No. 11 Cr. 665 (S.D.N.Y. Oct. 11, 2011), Sentencing Transcript (attached hereto as Exhibit 19) at 18-19. Judge Patterson relied on the fact that the defendant "engaged in a number of civic activities not as a figurehead, but as a participant, a person who gave of himself, not just of his wallet, and engaged in community activities to help his community. And that's significant." *Id.* at 19.

In *United States* v. *Greene*, 249 F. Supp. 2d 262 (S.D.N.Y. 2003), Judge Scheindlin found that a downward departure of seven levels and a sentence of three years' probation was appropriate where the defendant had donated his time, not just his money, to charitable work and community service. 249 F. Supp. 2d at 267; *see also United States* v. *Serafini*, 233 F.3d 758, 775-76 (3d Cir. 2000) (upholding a downward departure based on the defendant's "exceptional" charitable acts, noting that they "weren't acts of just giving money, they were acts of giving time, of giving one's self. That distinguishes [the defendant] . . . [whose] acts of personal kindness and good works were above and beyond") (internal citation and quotation marks omitted).

Mr. Simonlacaj's lifetime of generosity to others similarly warrants a non-custodial sentence. As noted in the numerous letters submitted to the Court, Mr. Simonlacaj does much more than contribute financially to charitable causes. As the Rev. Peter Popovich notes, "John was able to find employment for over fifty newly arrived immigrants that were having a hard time sourcing work due to their language barrier." (Letter of Rev. Peter A. Popovich, (Ex. 5) at 1). A number of these individuals have written to the Court directly, and credit Mr. Simonlacaj for changing their lives, and those of their families, in a profoundly positive way. As Mr. Ujka notes, "John Simonlacaj has helped dozen[s] and dozen[s] of people that were waiting for a change in their life, a turn for the better or in plain English a God Send when times are very tough." (Letter of Marel Ujka, (Ex. 9) at 1).

Numerous other letters attest to Mr. Simonlacaj's extraordinary commitment to "help[ing] unconditionally" others in his community, and giving them the same opportunity he has had to "live the American dream," while asking nothing in return. (Letter of Marel Ujka, (Ex. 9) at 1; Letter of Pal Kapaj, (Ex. 8) at 1; Letter of Ndoke Prebibaj, (Ex. 7) at 1). Such selflessness is not merely uncommon, it is exceedingly rare, and strongly supports a non-custodial sentence. *See Peterson*, Sentencing Transcript (Ex. 19) at 19 (noting defendant's "concern for his fellow man and doing something about it, not just writing a check or – but doing something about it himself").

### 3. A Sentence of Probation Would Constitute Ample and Appropriate Punishment for Mr. Simonlacaj's Offense.

A sentence of probation would adequately reflect the seriousness of Mr. Simonlacaj's offense. Probation is not an "act of leniency," but rather, "a substantial restriction of freedom." *Gall*, 552 U.S. at 44 (quoting *United States* v. *Gall*, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005)). Such a restriction on Mr. Simonlacaj's physical movements, and his continued accountability to

-19-

the Court, would serve as a constant reminder of the gravity of his offense, and provide ample punishment. *See United States v. Coughlin*, No. 06-20005, 2008 U.S. Dist. LEXIS 11263, at \*22 (W.D. Ark. Feb. 1, 2008) (finding "[i]mprisonment is unnecessary because probation can accomplish the goals of punishment").

Mr. Simonlacaj deeply and genuinely regrets his offense, and has had to endure the shame of admitting it to his family and close friends. As Mr. Simonlacaj's wife Drita notes, "[m]y husband and I stay up every night for hours at a time, talking about what has occurred." (Letter of Drita Simonlacaj, (Ex. 1) at 3). The Justice Department's own press release states that Mr. Simonlacaj has been "held accountable for his role in filing a false tax return." There is also no serious argument that Mr. Simonlacaj presents a substantial risk of recidivism.[9] For the same reasons, a sentence of probation, coupled with the Justice Department's publicizing of Mr. Simonlacaj's guilty plea, adequately address the need to provide general deterrence to others.

4.    *A Sentence of Probation is Consistent with Sentences Imposed in Comparable Cases.*

In determining an appropriate sentence, the Court is also required to consider "the need to avoid unwarranted sentenc[ing] disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Courts in this and other Circuits have imposed probationary sentences, and sentences significantly below the applicable

---

[9]    The United States Sentencing Commission has noted that "[r]ecidivism rates decline relatively consistently as age increases." United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 12, 28 (2004), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (explaining that the recidivism rate for defendants with a Criminal History Category I, who are between the ages of 41 and 50 years of age, is 6.9%, compared to defendants who are under 21, whose recidivism rate is greater than 29.5%).

Guidelines range, in criminal tax cases involving similar or far more egregious conduct than that at issue here. For example:

- In *United States v. Shokler*, No. 12 Cr. 415, 2013 WL 4851695 (E.D.N.Y. Sept. 10, 2013), the defendant pled guilty to all counts of a six-count indictment, including to aiding in the filing of false corporate tax returns, with a resulting tax loss of over $592,000 – several times the loss at issue here. The Sentencing Guidelines range was 24-30 months' imprisonment. The Court sentenced the defendant to two years' probation, plus restitution.

- In *United States v. Villella*, No. 07 Cr. 287-02 (RWS), 2007 WL 2845290 (S.D.N.Y. Sept. 25, 2007), the defendant pled guilty to one count of tax evasion. The tax loss was $111,000, and the Guidelines range was 10-16 months' imprisonment. The Court imposed a sentence of 60 months' probation.

- In *United States v. Floyd*, the defendant pled guilty to one count of conspiracy to defraud the IRS. The tax loss was $103,829, and the Guidelines range was 18-24 months' imprisonment. The Court imposed a sentence of three years' probation. Minute Entry of Sentencing, *United States v. Floyd*, No. 10 Cr. 309 (S.D.N.Y. Apr. 2, 2013), ECF No. 90; Sentencing Memorandum at 5, *United States v. Floyd*, No. 10 Cr. 309 (S.D.N.Y. Apr. 2, 2013), ECF No. 85.

- In *United States v. Warner*, 792 F.3d 847, 850 (7th Cir. 2015), the defendant pled guilty to one count of evading $5.6 million in taxes. The Guidelines range was 46-57 months' imprisonment, but the Seventh Circuit upheld the district court's sentence of two years' probation with community service, plus a $100,000 fine.

- In *United States v. Olenicoff*, the defendant controlled and hid assets in undisclosed offshore accounts, resulting in a tax loss of *$52 million*. The Court sentenced the defendant to two years' probation and 120 hours of community service. Sentencing Transcript at 8, 24, *United States v. Olenicoff*, No. 07 Cr. 227 (C.D. Cal. Apr. 23, 2008), ECF No. 18.

- In *United States v. Homann*, the defendant pled guilty to failing to file a report of Foreign Bank and Financial Accounts, where he controlled a foreign account containing approximately $5 million. The Court imposed a sentence of five years' probation, and 300 hours of community service. Minutes Entry of Sentencing, *United States v. Homann*, No. 09 Cr. 724 (D.N.J. Jan 6, 2010), ECF No. 9; *see also* Lynnley Browning, *New Jersey Businessman, a UBS Client, Pleads Guilty to Tax Evasion*, N.Y. Times, Sept. 25, 2009, *available at* http://www.nytimes.com/2009/09/26/business/26ubs.html?_r=0.

The sentence imposed by this Court in *United States v. Libous* is particularly instructive. There, after a bench trial, the Court convicted the defendant of three counts of filing a false income tax return. (*Id.*). The defendant's offense conduct took place over three tax years and

-21-

resulted in a tax loss of approximately $38,000. (*See* Sentencing Transcript (Ex. 17) at 11-15, 22). The defendant's Criminal History Category of I and the base Offense Level of 14 resulted in a Guidelines sentencing range of 15 to 21 months' imprisonment. (*Id.*). Significantly, unlike Mr. Simonlacaj, the defendant did not accept responsibility for his offense, even at his sentencing, and continued to protest that the evidence at trial was insufficient to prove his guilt for certain of the charged tax years. (*Id.*). Nonetheless, the Court noted that "Mr. Libous has paid his taxes, as well as penalties and interest," for certain of the relevant tax years, which was "a substantial mitigating factor for sentencing." (*Id.* at 55). The Court also gave mitigating weight under Section 3553(a) to the defendant's family circumstances, which included an elderly, ill father and a young son and wife who relied on him, and the impact on his business, as well as his charitable works, which the Court noted were "not extraordinary," and imposed a sentence of six months' imprisonment, a variance of nine months below the low end of the Sentencing Guidelines range. (*Id.* at 54-57).

Here, Mr. Simonlacaj begins with a lower Offense Level of 13, and a Guidelines range of 12 to 18 months' imprisonment. He has fully accepted his responsibility, not only by pleading guilty without requiring the Government to seek an indictment, but by paying back to the IRS an amount far in excess of the Government's tax loss calculation. Mr. Simonlacaj has also voluntarily paid his additional state taxes despite the fact that he has not even been contacted by state taxation authorities. (*See Libous,* Sentencing Transcript (Ex. 17) at 31) (noting that if the defendant "wanted to demonstrate extraordinary rehabilitation or an extraordinary level of contrition," he could have paid owed taxes without them being calculated or assessed by the IRS). Unlike the defendant in *Libous*, Mr. Simonlacaj's history of generosity toward others *is* extraordinary, as would be the impact on his family from a sentence of incarceration. Based on

this Court's approach in the *Libous* case, and on the numerous other precedents cited above, a sentence of probation as recommended by the Probation Office is clearly appropriate.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court sentence Mr. Simonlacaj to a term of probation.

Dated: New York, New York
        September 2, 2016

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

By: _____
Anirudh Bansal
Samantha Lawson
Katherine Lihn
Jacquelyn Ryberg
80 Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Defendant John Simonlacaj*