# EXHIBIT 13

August 2, 2016

Your Honor,

I am writing this letter to you on behalf of John Simonlacaj and wish to attest to his character. John is a dear friend and this may seem surprising as I am a stay at home Mother of 3, soon to be 4. John works full time in NYC to support his family. For starters, John and I come from the "same place" as first generation Americans whose parents came to this great country as immigrants with no money or resources. Both of our families worked indescribably hard to build a better life and fulfill the American Dream. That was no small fete, but it was made possible by deep faith, perseverance and commitment to family. These values were instilled in us daily and this would lead us to find a natural bond as friends. John will stand before you soon, but please know, there is more to John than his mistakes.

John and I have children the same age. It is impossible to speak of John without speaking of his kids. This is where is he is most alive. His love for his children, his role as their Father is who John is at his core. A true family man who loves and gives unconditionally. John loves his children with the warmth and zest of a Norman Rockwell painting. His commitment to his wife and children are only paralleled to the tremendous respect he has for his parents. You see, he still lives in the same home as his aging parents. This arrangement wasn't made when they retired, it has always been John's top priority to care and provide for his entire family. This isn't always easy but John takes the tough moments and uses them as teaching moments to his children.



Another aspect of John that is important to be aware of is his tremendous faith. Please know that John is not a man of ego. John is actually a man of Faith., Prayer, and Humility. When he speaks of his religion, of God, his reaction is visceral. You can see and feel that this man knows he has the good Lord to thank for his health and that of his children. His deep faith breeds his enormous compassion. Two years ago my husband's Father ███ ███████████████ and my Mother ████ ████████████████████ ████ Our family was inconsolable. John knew leaving the house was difficult so he invited us over to his home where we could bring our kids. John's wife prepared a home cooked meal and John entertained us all with hours of karaoke , John at the mic. John has made this a tradition, continuing to open his home to us and our children to replace the sadness with happy memories.

Your Honor, I ask that you read this letter and please consider that there is more to the man standing before you than his mistakes. He a caring and generous person who has clearly lost his way. The lesson will not be lost on him, this I guarantee. I ask that you have mercy on John and consider exercising your leniency.


Sincerely,

Norma Zagreda

# EXHIBIT 14



July 18, 2016

Re: <u>Letter of Reference for John Simonlacaj</u>

Your Honor:

I am writing to you in support of John Simonlacaj.

I am the ███████ █ █████████████ ████████████ and have nearly ████ █ ███████████ ███ █ █████ John Simonlacaj for ███████ █ █ ████ and have found him to be a stand up guy who always does the right thing given any situation – whether it be personal or professional. I have always been impressed with John's values, work ethic and, loyalty. We have spent significant time together outside the office as well, as we daughters the same age. It has really given me an opportunity to see how devoted John is to him family. His children adore him and he adores them. John is quick to give advice and even quicker to lend a hand. He has a heart of gold and I can always rely on him. ███████████████████████ y and when John heard, he called to ask me what he could do to help me in my time of need. He later showed up to my mother's house with platters of food for our guests during the shiva. I can't tell you how much this meant to me and my family.

Your Honor, this is the John I treasure as a friend. He realizes his mistake in filing a false tax return and has expressed remorse to me many times in our conversations. I would ask Your Honor for any leniency you can give John in this matter.

Sincerely,

Laurie Golub
████████████

# EXHIBIT 15

To Whom It May Concern:

We appreciate the support of Mr. John Simonlacaj. His patronage of various events and galas in the past has helped ensure the success year over year. Hi past support of the Muscle Team Gala has helped raise funds for the ███████████ and to help send children to the annual ████ ███████████████ is here for our families in hometowns across America to empower the kids and adults we serve. From offering support groups and educational seminars that help caregivers, parents and individuals through their journey — to assisting families with durable medical equipment to maintain independence — to giving kids with muscular dystrophy the best week of the year at ████ ███████████ █████ is here to help families maintain and improve their health while actively pursuing education, passions, careers, dating, marriage and other goals associated with living independently.

Best Regards,

*Carty Connolly*

# EXHIBIT 16

██████████████████████

June 22, 2016

To whom it may concern:

I write this letter as the ████████ ██ ████████
████████████████████████ in support of John Simonlacaj. John has been a friend
and ardent supporter of the ████████████ ████ ████████████ for
nearly a decade.

████████████ ████████████████ ████████ ████████████
████████████ ████████████████████████████ ████ Over
the past 60 plus years, ████████████████ has revolutionized medical care in
Israel: pioneering Israel's first open-heart, artificial heart, congenital heart
defect surgeries, founding its foremost rehabilitation facility, and introducing
the most advanced medical technologies to Israel and the world. Funding of
this strategic and revolutionary medical center is the core mission of ████████
████████ ████████████████████████ to strengthen this premier medical institution
and to provide it with the necessary funds to expand infrastructure, acquire
cutting edge equipment and support some of the world's most dynamic
biomedical research – research which has time and again resulted in
groundbreaking discoveries and innovations.

Over the past 9 years, I have come to know John to be a good person. He is
hard working and really cares about █████ and the work we are doing. He has
been respectful of everyone at our organization and is well-liked by my team.
He always has a kind word and a never-ending supply of energy to help. He has
never turned us down when asked to do something and has always given his
100% commitment when he takes something on. John has helped us to raise
millions of dollars for █████ ████████████ over the last decade and over $1
million for each of the last two years!

John is a committed family man and great father. Over the years, I've heard
him tell countless stories about his children and he has brought them to some
of our events. He has taught them about the importance of doing charity work
and "giving back" and is a great role model in this regard.

I cannot speak highly enough about John and his contributions to █████
████████████ We think the world of him as a supporter, fund-raiser, family
man, and most importantly, as a human being. If you would like to discuss
John, please don't hesitate to call me at █████ ████████

Sincerely,

Helene Feldman, ████████████

████████████████████

# EXHIBIT 17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
UNITED STATES OF AMERICA

                    v.                    14 CR. 448 (VB)

MATTHEW LIBOUS,

                         Defendant.
----------------------------------x
                         U.S. Courthouse
                         White Plains, N.Y.
                         May 18, 2015
                         2:00 p.m.


Sentencing Before:    HON. VINCENT L. BRICCETTI,
                      United States District Judge


APPEARANCES

PREET BHARARA
United States Attorney
Southern District of New York
300 Quarropas Street
White Plains, N.Y.  10601
BY:  JAMES McMAHON
     ANDREW J. KAMEROS
Assistant United States Attorneys

JOHN C. MERINGOLO, Esq.
ANJELICA B. CAPPELLINO, Esq.
DAVID DeSTEFANO, Esq.
375 Greenwich Street, 7th Floor
New York, N.Y.  10013
Attorneys for Defendant

Sue Ghorayeb, R.P.R., C.S.R.
Official Court Reporter

1          THE CLERK:  United States of America against

2     Matthew Libous.  Will counsel please note their appearance

3     for the record.

4          MR. McMAHON:  Yes.  Good afternoon, Your Honor.

5     James McMahon, Assistant United States Attorney, for the

6     United States, and I'm joined at counsel table by Andrew

7     Kameros, a Special Assistant United States Attorney.

8          MR. MERINGOLO:  Good afternoon, Your Honor.  John

9     Meringolo, with Anjelica Cappellino and Dave DeStefano, and

10    John Astarita, for Mr. Libous.

11         THE COURT:  Okay.  Have a seat everybody.

12    Good afternoon.

13         All right.  This matter is on for sentencing today.

14    The Defendant having been found guilty after a non-jury trial

15    of Counts Two, Three and Four of the Superseding Indictment

16    charging him with willfully subscribing false personal income

17    tax returns for the years 2007, 2008 and 2009, respectively.

18         I have reviewed the following materials in

19    preparation for sentencing:

20         The revised PSR, dated April 17th, 2015, prepared

21    by Probation Officer Sara K. Willette.

22         Defense counsel's sentencing memorandum, dated April

23    22nd, 2015, as well as letters and materials attached thereto.

24         The Government's sentencing memorandum, dated May

25    6th, 2015.

1           I have received and reviewed additional letters

2    from defense counsel dated May 12th and May 15th, and also

3    an additional letter from the Government dated May 15th.

4    I will note that I don't recall anyone asking permission to

5    file replies or surreplies or replies to surreplies, and part

6    of me just wants to ignore all of those extra letters, but

7    I'm not going to do that.  I have read them all.

8           In the future -- this is -- it should be to both

9    sides, but the Government should know this already -- there

10   shall be no replies when it comes to sentencing memoranda

11   unless you ask permission first, especially in a case like

12   this where -- I don't know what the exact count is, but the

13   Government's -- the Defendant's sentencing memo is a

14   several-pound three-ring binder that I have in my hand, and

15   the Government submitted a 60-plus-page sentencing memo

16   itself, and nothing in those additional submissions helped me

17   in any way, shape or form in terms of deciding what to do in

18   this case, the additional ones beyond the original sentencing

19   memorandum.

20          Has anything else been submitted that I failed to

21   mention?

22          MR. McMAHON:  Not from the Government.

23          THE COURT:  Mr. McMahon.

24          MR. McMAHON:  No, sir.

25          THE COURT:  Mr. Meringolo.

Sue Ghorayeb,  Official Court Reporter

1          MR. MERINGOLO:  Nothing from the defense.

2          THE COURT:  All right.  Mr. Meringolo, have you read

3     the Presentence Report and discussed it with your client?

4          MR. MERINGOLO:  Yes, I have, Your Honor.

5          THE COURT:  Mr. Libous, have you read the

6     Presentence Report?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  Have you discussed it with your

9     attorney?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  Mr. McMahon, have you read the

12     Presentence Report?

13          MR. McMAHON:  Yes, Judge.

14          THE COURT:  All right.  You can have a seat.

15          The Presentence Report calculates the sentencing

16     range as follows:

17          It says that the Base Offense Level is 14 under

18     Guidelines Sections 2T1.1 and 2T4.1.  It has a two-level

19     upward adjustment for abuse of a position of private trust,

20     such that the Final Offense Level is 16.

21          It says that the Defendant has no criminal history

22     points and therefore is in Criminal History Category I.

23          Thus, according to the PSR, the sentencing range is

24     21 to 27 months imprisonment.  The supervised release range

25     is up to one year per count, and, according to the PSR, the

1   fine range is $5,000 to a $104,000.

2            Now, there are a number of disputes about the

3   various aspects of the Guidelines, so I'm going to address

4   them, and then I may have some questions as we go forward.

5            So, let me just start by saying that I am well-aware

6   of my authority to consider acquitted conduct in determining

7   the applicable Guidelines range to the extent I find that the

8   conduct has been proven by a preponderance of the evidence.

9   However, the law is also clear that I am not required to take

10  acquitted conduct into account in calculating the range and

11  I decline to do so here.

12           And before I go on, I just want to ask Mr. McMahon

13  a direct question.  Did you, in preparing your sentencing

14  memorandum, think about whether there was a chance that given

15  the nature of the acquittal in this case, which essentially --

16  it's not limited to this, but, essentially, it boiled down to

17  a determination by me, which I stated on the record, that the

18  Defendant had relied in good faith on accountants -- on an

19  accountant's advice.

20           So, my question is:  In light of that, did you think

21  that there was any chance, and I mean any chance, anything

22  more than zero, that I would, notwithstanding that -- and I

23  recognize the burden of proof is different, but that's not

24  really what I'm talking about.  Notwithstanding my finding

25  that he relied in good faith, that I would nonetheless find

1    a way to say that the acquitted conduct was proven?

2            In other words, I have to find that he didn't rely

3    on good faith in order for me to find that.

4            So, I'm curious as to whether you actually thought

5    there was anything more than a zero chance?

6            I need a direct answer to that.

7            MR. McMAHON:  Yes.  Yes, I did, and I based that

8    on --

9            THE COURT:  Because that was a ridiculous decision

10   on your part.  But, in any event, at least, I trust you.  If

11   you tell me that you thought there was something more than a

12   zero chance, then I would say that your arguments are not

13   frivolous.  So, we'll leave it at that.

14           MR. McMAHON:  Fine.

15           THE COURT:  But, in any event, I'm not going to

16   consider acquitted conduct here.  The reasons should be

17   obvious, but I'm going to put them on the record.

18           First of all, I do not find that willfulness as to

19   the 2010, 2011 and amended 2011 tax returns has been proven

20   by a preponderance of the evidence.

21           As I said at the trial, the principal reason for

22   finding the Defendant not guilty on Counts One, Five, Six and

23   Seven is that Mr. Libous relied in good faith on the

24   accounting advice he received from his tax preparer, Mr.

25   Marino.  I'm not going to repeat what I said before.  The

1    bottom line is that Mr. Libous's good faith reliance on his

2    accountant's advice means he did not willfully file false tax

3    returns for 2011 -- 2010 and 2011, but also means Mr. Libous

4    did not willfully engage in a single course of criminal

5    conduct for the period from 2006 through 2013, which is what's

6    charged in Count One.

7              His good faith reliance on his accountant's advice

8    also means that the Government has not proven willfulness even

9    by a preponderance of the evidence standard.  It's not enough

10   for the Government to prove that Libous underreported his

11   income for all these years.  The Government would still have

12   to prove willfulness -- I'm talking about acquitted conduct

13   right now -- albeit on a lower standard of proof, in order for

14   me to find that the acquitted conduct should be taken into

15   account.  I specifically find that the Government has not

16   proven willfulness by a preponderance of the evidence.

17             I also said at the trial that the Government had not

18   proven beyond a reasonable doubt that Mr. Libous was not

19   reimbursing himself for legitimate business expenses in 2010

20   and 2011 and 2012.  Again, this is all part of the acquitted

21   conduct.  I was not convinced then and I remain unconvinced

22   even under a preponderance standard that there were no

23   business expenditures that corresponded to these

24   reimbursements.

25             Of course, this does not mean Mr. Libous does not

1 owe taxes for the years of which he was acquitted. The

2 returns were false, but Mr. Libous did not willfully file

3 false tax returns for 2010 and 2011, and therefore I'm not

4 going to punish him as if he did, which would be the effect

5 of including the acquitted conduct in the calculation of

6 guideline range. I'm not going to do that.

7 At the end of the day, I am required by law and by

8 the need to do justice to impose a fair and reasonable

9 sentence for the conduct of which Mr. Libous was convicted; a

10 sentence sufficient but not greater than necessary to comply

11 with the purposes of sentencing set forth in Section 3553(a)

12 of Title 18 of the United States Code.

13 In this case, under all the relevant circumstances,

14 I believe that taking the acquitted conduct into account would

15 be unjust. The Government had a full and fair opportunity

16 to prove that Mr. Libous acted willfully with respect to the

17 2010 and 2011 tax years, it failed to do so. I'm not going

18 to punish him as if they did.

19 Now, what I have said applies to the charged conduct

20 of which Mr. Libous was acquitted, it does not necessarily

21 apply to all of the uncharged conduct about which I heard

22 extensive testimony at trial, and, specifically, it does not

23 apply to the legal fees he received in 2006 that he did not

24 tell his accountant about and did not report on his 2006 tax

25 return. As I recall the testimony, the amount of these fees

1  was $31,661 and his accountant did ask him about the

2  additional income -- about any additional income.  This is not

3  acquitted conduct.  Also, there is no defense of good faith

4  reliance with respect to these unreported fees, for reasons

5  that I spelled out at the time of the verdict, and I'm not

6  going to repeat myself now.  Therefore, it is clear that Mr.

7  Libous willfully filed a false 2006 tax return, and I so find.

8              It is also clear that his unreported legal fee

9  income in 2006 is relevant conduct under Guidelines Section

10  1B1.3, because it was part of the same course of conduct as

11  the offenses of conviction, and I so find.

12              However, I do not find that the inflated home office

13  deduction in 2006 is relevant conduct.  First of all, it's

14  unclear what the inflated amount is and how it affected his

15  tax liability.  Also, I don't believe the Government proved

16  willfulness with respect to this deduction even by a

17  preponderance, and I do not intend to further complicate this

18  already complicated proceeding by holding an evidentiary

19  hearing on this item, which involves a relatively small amount

20  of money, although, again, we don't know exactly how much

21  money, but which involves a relatively small amount of money

22  and which I do not believe will affect the Guidelines

23  calculation in any event.

24              Also, the inflated home office deduction piece of

25  this is not relevant conduct to the offenses of conviction,

1    because it does not involve unreported income.  The 2007,

2    '08 and '09 counts of conviction all involve some form of

3    unreported income.

4            I also do not find that the alleged stolen rent

5    checks in 2006 constitute relevant conduct.  First of all,

6    the alleged theft hasn't been proven by a preponderance of

7    the evidence and I'm not going to unduly complicate this

8    proceeding with an evidentiary hearing as to this relatively

9    small amount of money, which I do not think would affect the

10   Guidelines calculation anyway.

11           Second, I do not think it is relevant conduct,

12   because it is very different conduct than simply not reporting

13   legal fees or fees for other services rendered or not

14   reporting the amount of personal expenses paid for by his

15   employer.

16           Finally, I specifically find under Rule 32(i)(3)(B)

17   that a ruling on this item is not necessary because the matter

18   will not affect sentencing.

19           The upshot of all this is that the relevant conduct

20   includes the following items:

21           For 2006, the $31,661 in unreported legal fees.

22           For 2007, $34,500 in unreported legal fees and/or

23   fees for other services rendered.

24           For 2008, $5158 of unreported legal fees -- again,

25   we are in 2008 now -- as well as $1,339 in personal expenses

1  paid for by Wireless Construction Solutions in 2008.  And

2  then, finally, in 2009, $24,594 in personal expenses paid for

3  by WCS in 2009.  Let me just stop for one second.

4          I do see that you both agreed that that personal

5  expenses number for 2008 went down substantially from what

6  was alleged at trial.  I am -- I need to hear this directly

7  from you, Mr. Meringolo.  Are you contending that it doesn't

8  affect the Court's judgment that there was sufficient proof

9  beyond a reasonable doubt for 2008?

10         I'm not sure what you are doing here exactly.  I

11  mean, it's fine for you to agree to a lower number, but it's

12  not the number that was alleged and proven at trial.

13         MR. MERINGOLO:  It was not, Your Honor, and that

14  was, you know, subsequent to the trial.

15         When I believe Ms. Penland was on the stand and she

16  said that she found things on the Internet.  My client -- you

17  know, we received that maybe three or four days before the

18  trial, that particular item, which was the Marshal's Service.

19  I believe it was like about $3,800 or so, and my client -- we

20  requested records, but we didn't receive it.  We received

21  those records thereafter.

22         THE COURT:  Okay.  But my question is:  Are you

23  making or are you --

24         MR. MERINGOLO:  No, no.

25         THE COURT:  -- waiving any argument?

Sue Ghorayeb,  Official Court Reporter

1          Well, here is the question.  That was not the way

2     the case was tried.  I mean, you know, I know it's a

3     relatively small amount and -- but the way the case was tried

4     is that that amount, meaning the personal expenses for 2008,

5     was substantially higher than $1,339.  It was $4,500; is that

6     right?  Is that what the number was?

7          MR. McMAHON:  It's over-5,000, Judge.

8          THE COURT:  All right.  Let's say -- let's just say

9     5,000 for purposes of discussion.  So, now, that's the way it

10    was charged at trial, and, of course, the amount of unreported

11    income may be relevant to materiality.  In other words, a

12    false return, even a knowingly deliberately false return which

13    is not materially false is not a crime.  We didn't -- I don't

14    think the issue of materiality was litigated.  I don't recall

15    it being -- the whole trial was about willfulness, it wasn't

16    about materiality.  But are you taking the position that --

17    and I just want to hear from you.

18          Are you taking the position that the agreed upon

19    lower number changes the -- you know, is relevant to the

20    question of materiality vis-a-vis 2008, which I guess is

21    Count 3?  Is that right, Count 3?

22          MR. MERINGOLO:  One moment, Your Honor.

23          THE COURT:  Sure.

24          MR. MERINGOLO:  Your Honor, at this time, we

25    would -- we would answer the question as yes.

1          THE COURT:  Okay.  I forget what the question was

2    now.  What's the answer?

3          MR. MERINGOLO:  Whether, whether it was a material

4    issue of --

5          THE COURT:  So, you think that it changes the

6    materiality aspect of this?

7          MR. MERINGOLO:  For 2008, the answer is, yes,

8    because it's substantially lower with that.

9          THE COURT:  What's the Government's position?

10         Neither of you addressed this in your briefs.  You

11   just sort of agreed that the number was different for

12   sentencing purposes, but it's not only different for

13   sentencing purposes, it's also different in the sense that the

14   total amount of unreported income for 2008 is, roughly, I

15   don't know, $4,000 less than it would otherwise be.  So, it

16   went from approximately $10,000 to approximately $6,000.

17         So, what's the Government's position about this

18   materiality question?

19         MR. McMAHON:  We disagree.  We believe that the

20   false statement in the tax return, which is what was charged

21   here, is still material even with this lower number.

22         THE COURT:  Okay.  Well -- so, I'm going to agree

23   with the Government on that.  I think it is material in light

24   of the overall amount of reported taxable income.

25         The reported taxable income -- I'm looking now at

1    the Government's chart that they provided in connection with

2    their sentencing memo.  If this is the wrong number, let me

3    know now.  But it says that, for 2008, the reported taxable

4    income was roughly $24,000 and the actual taxable income was

5    roughly $30,000, which is roughly 25 percent higher than the

6    reported taxable income.

7            Am I getting those numbers correct?

8            MR. McMAHON:  Yes.

9            THE COURT:  And the 30,000 number is with the lower

10   agreed upon amount for reimburse -- I'm sorry, for personal

11   expenses that were paid for by the company.

12           So, I find -- I'm not sure that I have been asked

13   to make this finding, but since this is a non-jury case, I

14   think it's prudent for me to make a finding that that would

15   not change my determination as to materiality.  In other

16   words, either way, the -- it's not just a question of actual

17   dollars, it's a question of percentages.

18           So, the amount of adjustments, if you will,

19   unreported income is roughly $6,100, and that is approximately

20   25 percent of the original reported taxable income amount,

21   which means, to put it another way, he underreported his

22   income by 25 percent, which is a substantial figure.  If it

23   was 2 percent, we might have a different conversation, but

24   it's not 2 percent.  It's in the nature of 25 percent or it's

25   in the area of 25 percent.

1            So, I find that the -- I stand by my original

2    determination that the evidence was sufficient to prove guilt

3    beyond a reasonable doubt with respect to 2008 for all the

4    reasons I said before, but with the slight amendment that even

5    with this lower or the lower amount, it's still a material, a

6    material amount of money that was unreported.

7            Okay.  So, doing the math quickly, it looks like the

8    total unreported amounts that I have just listed add up to

9    $97,252, and according to the Government, this results in a

10   tax loss or tax losses I should say as follows:

11           For 2006, the tax loss is $14,308.  For 2007, it's

12   $15,563.  2008, it's $2,025.  In 2009, it's $6,947.

13           That's the Government's calculations using the

14   alternative method of calculating tax loss under the

15   Guidelines.  We all know that there is the 28 percent

16   calculation, that's sort of a default calculation unless -- as

17   the Guidelines say in Section 2T1.1, Note A, it says, "unless

18   a more accurate determination of the tax loss can be made."

19           So, that's, that's what the Government is doing,

20   and, in fact, Mr. Meringolo also submitted a calculation of

21   tax loss under this alternative approach.  In any event,

22   these figures represent combined tax loss for federal, state

23   and New York City income taxes for these years, all of which

24   are properly included for sentencing purposes under U.S.

25   against Fitzgerald, 232 F.3d 315 (Second Circuit 2000).

1           I don't think you are disagreeing that federal,

2    state and local taxes are all considered; is that correct?

3           MR. MERINGOLO:  That is correct, Your Honor.

4           THE COURT:  All right.  So, the total tax loss for

5    sentencing purposes for the three years of conviction --

6    counts of conviction, plus the one additional year in which I

7    believe that the false tax return was relevant conduct, the

8    total tax loss is $38,843.  Under 2T4.1, the Base Offense

9    Level is 14.

10          The Defendant has contested whether acquitted

11   conduct should be taken into account, as well as whether the

12   2006 -- excuse me, as well as the 2006 conduct should be taken

13   into account.  I have largely, but not completely, obviously,

14   ruled in the Defendant's favor on these matters.

15          So far as I can tell, the Defendant is not

16   contesting the accuracy of the Government's calculation of tax

17   loss as to the items I have specifically said are included in

18   relevant conduct except to the extent perhaps of saying that

19   the Government's numbers are too low.  Because your

20   accountant's calculation of the actual tax loss -- I'm not

21   talking about the 28 percent figure, I'm talking about the

22   actual calculation of tax loss -- is actually slightly higher

23   than the Government's.  Am I right about that?

24          MR. MERINGOLO:  That is correct, Your Honor.

25          THE COURT:  So, you couldn't very well complain

1    that the Government's numbers are wrong in that sense.

2            MR. MERINGOLO:  Absolutely not, Your Honor.

3            THE COURT:  All right.  Mr. Livorsi, is that his

4    name, your accountant?

5            MR. MERINGOLO:  Yes, Your Honor.

6            THE COURT:  Okay.  His calculation for '07, '08 and

7    '09 totaled approximately $26,000, but, of course, that did

8    not include 2006, which involved more than $30,000 of

9    unreported income.

10           I believe you attached the 2006 amended returns to

11   your memorandum, and when you include the additional taxes

12   owed for 2006, there is no question that the total tax loss,

13   including 2006 -- I know you don't agree that it should be

14   included, but if you do include it, the total tax loss clearly

15   exceeds $30,000.

16           MR. MERINGOLO:  That is correct.

17           THE COURT:  Would you agree with that?

18           MR. MERINGOLO:  We agree, Your Honor.

19           THE COURT:  So, if it exceeds $30,000, then there's

20   no question that the Base Offense Level is 14 no matter which

21   calculation you use.

22           MR. MERINGOLO:  Correct.

23           THE COURT:  All right.  Now, there is some

24   additional items that I need to resolve.

25           The Government is seeking a two-level upward

                Sue Ghorayeb,  Official Court Reporter

1    adjustment under 2T1.1(b)(1) on the theory that Mr. Libous

2    failed to report income exceeding $10,000 from criminal

3    activity for each of the years '09, '10 and '11.  The

4    Government contends that the payment by WCS of Mr. Libous's

5    personal expenses in each of these years constituted fraud

6    against WCS or theft.  They sort of used the words

7    interchangeably.  There is, of course, a difference between

8    fraud and theft, but, in any event, fraud or a theft against

9    WCS.  That application is denied for the following reasons:

10   First, Mr. Libous was not charged, let alone

11   convicted, of defrauding WCS or stealing money from WCS.  It

12   seems that the Government not only wants me to punish the

13   Defendant on the tax counts, which it lost at trial, it also

14   wants me to punish the Defendant on a complex and fact-

15   intensive fraud theory that it never presented to the grand

16   jury or at trial.  At least, I'm not aware that they presented

17   it to the grand jury.

18   Moreover, the evidence at trial does not support the

19   conclusion that Mr. Libous hid his conduct from WCS or lied to

20   others at WCS or otherwise acted with criminal intent -- and

21   that's the most important part of this -- as to WCS in

22   arranging for his personal expenses to be paid by WCS.

23   I believe the way I put it at trial was that there were no

24   badges of fraud typical or you might see in a case like this.

25   But I would also note that when Mr. Boemio, the

1     majority partner of WCS, learned in 2011 that Libous was

2     running his personal expenses through WCS, he didn't fire

3     Libous or sue Libous or report him to the police; instead, he

4     told him to take a raise.  In other words, he said, "look, you

5     can keep the money and you can continue to take that level of

6     compensation, just do it in the form of a higher salary."

7               Even when Boemio later learned that the raise

8     Libous paid himself was larger than expected, which upset him,

9     he did not demand the money back or fire Libous, he just sold

10    the company to Libous.

11              On these facts, there is zero chance -- not slightly

12    more than zero, but actually zero chance -- that Libous would

13    ever be convicted of fraud or embezzlement, even if for some

14    reason the Constitution was changed and the standard of proof

15    was lower than beyond a reasonable doubt.  Presumably, that's

16    why he was not charged with these offenses.  In any event, I

17    find that the Government cannot prove by a preponderance of

18    the evidence that Libous failed to report income exceeding

19    $10,000 from criminal activity, that's the issue.

20              This is a tax case and not a theft case, and the

21    exact amount of tax loss resulting from the offenses of

22    conviction has been determined.  The base offense level

23    corresponding to that tax loss amount establishes a sentencing

24    range that involves imprisonment.  There is no reason to

25    believe that the tax loss in this case understates the

1    Defendant's culpability or the seriousness of the offense.

2    Therefore, there is no need to unduly complicate this

3    proceeding with a difficult and time-consuming hearing as to

4    intent to defraud or to steal, and I decline to do so.

5            Next, the Government is seeking a two-level upward

6    adjustment for abuse of position of trust under Section 3B1.3.

7    That application is also denied for essentially the same

8    reasons I denied the two-level enhancement for criminally

9    derived proceeds.

10           Again, this is a tax case.  It's a serious matter,

11   but that's what it is.  It's a tax case.  Mr. Libous was not

12   charged with defrauding or otherwise harming his employer,

13   WCS.  When Boemio found out what Libous was doing, he told

14   him to take a raise.  It's arguably an unusual response, but

15   that was his response.

16           There certainly is insufficient evidence that Libous

17   stole money from WCS.  The crime of conviction was filing

18   false tax returns.  His alleged theft of WCS funds was

19   therefore not part and parcel of the crime of conviction.  If

20   it was a crime, it was an entirely different crime, and as I

21   have said, I don't believe the Government has proven intent

22   to defraud WCS or intent to steal from WCS.

23           Under these facts, it has not been established that

24   WCS was a victim or that Libous, in fact, abused the position

25   of trust that he occupied.

1        All right.  I'm going to address an issue now which
2   is not strictly speaking an aspect of the Guidelines
3   calculation, but I don't know where else to fit it in, so
4   let me talk about that now.

5        The Government contends that Mr. Libous deliberately
6   doctored a urine sample that he provided to the Probation
7   officer, at the time of his presentence interview, in order to
8   conceal the fact that he had used marijuana.  The Government's
9   theory is that the test showed a "low creatinine level," which
10  must be because the Defendant diluted the sample by consuming
11  large quantities of fluids, such as water, shortly before
12  providing the sample.

13       Of course, the Defendant could have consumed large
14  quantities of water for other reasons, in other words, other
15  than to deliberately dilute the sample, such as being thirsty,
16  and even if he did consume large quantities of water, that
17  doesn't come close to proving that he did so with the intent
18  to dilute the sample or, as the Government acknowledges, the
19  lab could have made a mistake.

20       In any event, Mr. Libous has never tested positive
21  for drugs during the course of this case, including on the day
22  in question.  This is a non-issue, it's inconclusive, and, in
23  any event, I find under Rule 32(i)(3)(B) that a resolution of
24  this dispute will not affect sentencing.

25       I would also -- I don't know if anyone else noticed

1    the irony of this, but it is somewhat ironic that the

2    Government has made such a fuss about this matter or about a

3    matter that has absolutely nothing to do with the crime of

4    conviction and it did so in its brief one paragraph after

5    arguing in its sentencing memorandum that the Defendant's

6    sentencing memorandum failed to focus on the crime of

7    conviction.  I find that ironic.

8          In other words, the Government is saying, "Judge,

9    don't give credence to the Defendant's sentencing memorandum

10    because it just focuses on things other than the crime of

11    conviction," and in the very next breath, the Government

12    focuses on something other than the crime of conviction.  If

13    anything, the Government's fixation on this issue, including

14    in its most recent letter from May 15th, tends to dilute --

15    and there is no pun intended there -- its much stronger

16    arguments about the seriousness of the offense.

17          The next issue is acceptance of responsibility, and

18    the Defendant contends he is entitled to a two-level downward

19    adjustment for acceptance of responsibility under 3E1.1.  This

20    is certainly not one of those rare instances in which someone

21    goes to trial and can still obtain a two-level downward

22    adjustment for acceptance of responsibility.  The bottom line

23    is that the Defendant has not clearly demonstrated acceptance

24    of responsibility for his offense, and, therefore, I deny that

25    request.

1          First of all, the Defendant has not admitted the

2    conduct comprising the offenses of conviction, because he has

3    not admitted that he willfully filed false tax returns for

4    '07, '08 and '09, or that he willfully filed a false tax

5    return for 2006.  He admitted that the returns were false, but

6    this entire criminal case was about willfulness and he

7    certainly hasn't admitted that he acted willfully.  He is not

8    required to admit that, but the bottom line is he has not.

9          Second, although a conviction at trial does not

10   automatically preclude consideration of this reduction, the

11   fact that he did put the Government to its burden of proof at

12   trial, as it was his right to do -- the fact is that he did

13   put the Government to its burden of proof at trial, as it was

14   his right to do.  It's not as if he went to trial solely to

15   preserve issues for appeal that do not relate to guilt, such

16   as a constitutional challenge to a search or a challenge to a

17   statute's applicability in this case.

18          It's true that the Defendant filed amended returns

19   and paid back taxes for the years of which he was convicted,

20   but he did that after trial, not before.  The bottom line is

21   that this is not one of those rare cases, as I said a moment

22   ago, in which a defendant should get acceptance points even

23   after going to trial.  The Defendant's request for a downward

24   adjustment under 3E1.1 is denied.

25          All right.  As far as this -- the Court's Guidelines

1    calculation is concerned, the Base Offense Level is 14.  There

2    are no upward or downward adjustments.  The Criminal History

3    Category is I, because the Defendant has zero criminal history

4    points.  And, so, I find that at Level 14, Criminal History

5    Category I, the sentencing range is 15 to 21 months

6    imprisonment.  The supervised release range is up to one year,

7    and the fine range is $4,000 to $77,686.  It's an odd number

8    because that's twice the amount of the gross loss.  So, that's

9    the fine range under the Guidelines.

10        Now, the Defendant has moved for a number of

11   Guidelines-based departures.  Actually, the sentencing memo

12   sort of combines departures and variances into the same boat,

13   but I need to address, because I'm required to do so,

14   departure motions.  So, I'm going to discuss the motions for

15   departure now, which leaves open a discussion of some of these

16   things, at least, with respect to whether the Court should

17   vary from the Guidelines.  That's a different question.  It's

18   a question that's hard for the public to understand the

19   distinction, but the lawyers here know the distinction.  So,

20   let me, let me address the motions for a downward departure.

21        First, Defendant contends that because the tax

22   Guidelines -- the Government -- I'm sorry.

23        The Defendant moves for a downward departure because

24   the tax Guidelines' focus on loss overstates the severity of

25   the offense.  That's the theory there.  That application is

1  denied.  The 15 to 21 months sentencing range here, based on

2  the tax loss figure of approximately $38,000, certainly does

3  not overstate the seriousness of the offense.  Cheating on

4  one's taxes is a serious offense, obviously.  The cases cited

5  by the Defendant in his brief involve sentencing ranges in

6  excess of 30 years or even up to life imprisonment.  Here, the

7  range is 15 to 21 months based solely on loss.  That range

8  plainly does not overstate the seriousness of the offense.

9          The second departure motion is the Defendant's

10  motion for departure based on family ties and responsibilities

11  under Section 5H1.6.  That application is also denied.  Mr.

12  Libous's family circumstances are actually quite ordinary and

13  unexceptional or -- strike that.  They are actually quite

14  ordinary and unexceptional.  They are not extraordinary or

15  exceptional.

16          In four-plus years on the bench, I have yet to

17  sentence a defendant who did not have a close -- who did not

18  have close family ties or whose family would not suffer if he

19  or she were incarcerated.

20          I have no doubt the Libous family, including the

21  Defendant's parents, his wife and child, would suffer both

22  emotionally and financially if he were incarcerated.  Again,

23  this unfortunately is an ordinary and routine consequence that

24  befalls a family when a loved one decides to engage in not

25  only unlawful but criminal conduct and gets caught doing so.

1           However, as I said, this is certainly a relevant

2    factor in determining the ultimate sentence, so I will

3    consider his family circumstances under 3553(a) in deciding

4    what sentence to impose.

5           The third motion is a motion for departure based on

6    the impact his incarceration would have on his business and

7    employees.  What I will call a Milikowsky departure.  It's a

8    Second Circuit case.  It's a pre-Booker case, sort of a court-

9    created doctrine, if you will, but, in any event, pre-Booker.

10    That application is denied because the Defendant has not

11    established that his incarceration would impose extraordinary

12    hardship on employees.  Hardship, no question about that, yes,

13    but extraordinary hardship, no.

14           Mr. Libous has presented no evidence that he is the

15    only person who can keep Wireless Construction Solutions

16    running.  I have no doubt that, if necessary, both Mr.

17    Libous's brother and his wife, both of whom work for WCS, can

18    step up on a temporary basis and keep the business going in

19    the event Mr. Libous is sentenced to jail or Mr. Libous can

20    promote someone from within the company.  There is, I'm told,

21    17 to 25 employees.  Surely there's -- there is certainly no

22    evidence that none of those employees can temporarily take

23    over the day-to-day operations of the business.  Mr. Libous

24    could also hire someone from outside the company to step in

25    and run the business temporarily in his absence.  So, there is

1    nothing extraordinary about these circumstances, but, again,

2    I will consider them, as I'm required to do, under Section

3    3553(a).

4            Finally, there is a motion for a downward departure

5    based on charitable service and other good works under

6    Section 5H1.11.  That application is denied.  Mr. Libous's

7    involvement in his church and its good works is admirable and

8    he deserves credit for that, but there is nothing

9    extraordinary about what he does for the church and its

10   members or the public that it serves or in what he does for

11   the community.  It's admirable, as I said, but it's not

12   extraordinary and it doesn't warrant a downward departure.

13   Again, I will consider his charitable service and good works

14   in determining an appropriate sentence under Section 3553(a).

15           All right.  I think that resolves the Guidelines

16   calculations and the Guidelines-based departure motions.

17   Although, as I said, I am not foreclosing consideration of

18   some of those factors in making the ultimate determination

19   of what sentence to impose that is sufficient but not greater

20   than necessary to comply with the purposes of 3553(a).  So,

21   we will address that.

22           Have I left off any Guidelines disputes?

23           I'm not talking about 3553(a) now.  I'm talking

24   about Guidelines issues.

25           MR. McMAHON:  No.  I think that's it, Judge.

1           MR. MERINGOLO:  No, Your Honor.

2           THE COURT:  All right.  Thank you.  Does the

3      Government wish to be heard on sentencing?

4           MR. McMAHON:  Yes, we do, Your Honor.

5           THE COURT:  Okay.

6           MR. McMAHON:  Judge, there's just a couple of

7      things.  You know, Your Honor has already noted that we have

8      put in 62 pages and if we didn't say it there, it may not be

9      worth saying.  So, I would just like to highlight a couple of

10      things here.

11           First of all, in sentencing this Defendant, you have

12      to consider that this is a man who really has demonstrated a

13      shocking lack of respect for the law despite the fact that he

14      was an attorney during the entire period of the offense

15      conduct and that continues to this day.  For example, even

16      though he has admitted civil liability for his taxes in 2010

17      and 2011, he has failed to pay them, even though he knew that

18      he was going to be facing sentencing here today, and he has

19      offered a number of excuses -- some of which border on the

20      ridiculous -- for that.

21           THE COURT:  And how about the excuse of:  "I'm going

22      to pay them.  I just need to -- this is not a year for which

23      I have been convicted and I just need to hear from the IRS

24      what they think I owe, so I don't over-pay, like I did for

25      the other years"?

1           MR. McMAHON:  Well, I think --

2           THE COURT:  That's -- that doesn't seem crazy to me.

3     I mean he is saying he wants -- he hasn't paid yet, that's

4     true, on that point you are right, but to say that there is

5     no possible explanation for -- no legitimate explanation for

6     that, I'm not sure I agree.

7           MR. McMAHON:  He has all the -- Judge, I have to

8     disagree with that.  He has all of the information that he

9     needs.  It was given to him in discovery.  He has got his bank

10    records, his credit card records.  He knows what we contend

11    criminally is a loss.  He has got professional help.  He has

12    got a personal accountant.  He has got a lawyer who can help

13    him put it all together.

14          THE COURT:  But he also was acquitted of those

15    years.  I know you don't agree with that decision.  I'm --

16    believe me, it's clear, but he was not found guilty.

17          MR. McMAHON:  Right.  Well --

18          THE COURT:  That makes those years different than

19    the other years, it just does.

20          MR. McMAHON:  But it's --

21          THE COURT:  It's just like any other criminal case

22    where you are convicted of something -- let's make it simpler.

23          Let's say you are convicted of stealing a thousand

24    dollars from somebody, and it comes to sentencing and it turns

25    out that you could have paid the thousand dollars back, but

1    you didn't.  All right.  Now, maybe you got a point there.

2    But let's say you are charged with stealing a thousand dollars

3    from one person and 2000 from another person.  You go to

4    trial.  You are convicted on the thousand, but you are not

5    convicted on the 2000.  Let's just assume that for a moment.

6                MR. McMAHON:  Mm-hmm.

7                THE COURT:  Is the person supposed to pay the 2000

8    anyway?

9                I mean, I really don't -- I understand the

10   difference here is that you believe that he did steal the 2000

11   from the other person, to use my hypothetical, but the bottom

12   line is, he wasn't convicted of that.

13               MR. McMAHON:  Can I --

14               THE COURT:  So, isn't that a reason not to pay it?

15               MR. McMAHON:  Yes.

16               THE COURT:  Although he said that he is going to

17   pay it and he has never suggested for a moment that he doesn't

18   owe it.  I'm just trying to figure out why you think it's so

19   outrageous that he hasn't paid it, that's my point.

20               MR. McMAHON:  Well, because -- Your Honor, let me

21   change your hypothetical just a bit.

22               Let's say that the acquitted $1,000 was also the

23   subject of a civil judgment.  The Defendant would then have a

24   legal duty to pay that judgment.  That's exactly what's

25   happening here and yet he is not doing that.

                    Sue Ghorayeb,  Official Court Reporter

1          THE COURT:  And how is it the subject of a civil
2   judgment, the acquitted --

3          MR. McMAHON:  Well, it's -- I'm using an analogy
4   here.  There is no dispute that he owes those taxes.

5          THE COURT:  But he hasn't been -- there is no
6   judgment.  There is a sort of a metaphysical lack -- it's --
7   but I mean the point is -- I mean it's -- the funny thing is,
8   I don't disagree with you, I just think you are pressing the
9   gas pedal a little bit too hard on this one.

10          If Mr. Libous wanted to demonstrate extraordinary
11  rehabilitation or an extraordinary level of contrition, then
12  one way that he could do that would be that he could say,
13  "you know what, even though I don't have the exact numbers --
14  no question that I owe the money.  I acknowledge I owe the
15  money.  So, I have paid the money, and if it turns out they
16  have to write me a refund check, fine, they can write me a
17  refund check, but I'm trying to show you Judge how contrite I
18  am for what happened."  And if he had done that, it would have
19  benefited him, I think it's fair to say.  I will tell you that
20  right now, that would have been a benefit to him.

21          In other words, he would have been better off in my
22  eyes if he had done that as opposed to not doing that.  So, in
23  that sense, you and I are not in disagreement.  But what I
24  don't agree with you on, that is, is your argument that his
25  failure to do so should be held against him in some way.

1      That's the part I'm not sure I agree with.

2            I would give him credit for it if he did it, but I

3      just find it hard to hold against someone the failure -- I'll

4      use the term loosely -- to make restitution for a crime that

5      he didn't commit.  He was found not guilty.  He is presumed

6      innocent.  The Government didn't prove -- didn't carry its

7      burden.

8            MR. McMAHON:  It's --

9            THE COURT:  He could have paid it and he might have

10     helped himself if he had, but failing to pay it, I'm not quite

11     ready to go so far as to say that that should cut against

12     him --

13           MR. McMAHON:  But it's not --

14           THE COURT:  -- or count against him.

15           MR. McMAHON:  It's not like restitution, Judge.  And

16     the difference between restitution and what's happening here

17     is that here we have a Defendant who has repeatedly, over the

18     period of two or three years, depending on how you count it,

19     ignored what is to him a known legal duty to file his tax

20     returns or amend his tax returns to make them accurate and pay

21     his taxes, and that's what he hasn't done here, and that's the

22     difference.  He has, essentially, if you will, blown off his

23     acknowledged legal duty.

24           THE COURT:  See, I don't think he has blown it off.

25     I think he has put it on hold for the moment, which I hope it

                    Sue Ghorayeb,  Official Court Reporter

1     doesn't mean that he has blown it off. I -- certainly, based
2     on his financial statement, he seems like he is capable of
3     paying those taxes, and if I were him, I would have paid them
4     already. That's what I would have done.

5     If I were him, I would have said, "you know what,
6     Mr. Meringolo, you are a great lawyer but just where do I send
7     the check? Let me send the check. We gotta send the check
8     eventually, let's just send it now. If I over-pay it, fine,
9     we'll get the money back later on." He would have been better
10     off if he had done that. What I'm -- and I'm not going to
11     belabor this point any further. I disagree with you that he
12     should be held -- that he should be treated worse because he
13     failed to do that. He just can't -- he shouldn't be treated
14     better. It's kinda of like -- it's almost similar to the
15     acceptance of responsibility.

16     You know, look, somebody -- no one is going to get
17     punished for exercising your constitutional right to go to
18     trial. You could be as guilty as guilty can be. You have a
19     constitutional right to a trial, and if you go to trial, you
20     are not going to be punished for exercising your
21     constitutional right. The flip side of that is, if you do
22     plead guilty, you are going to get rewarded for that.

23     So, there is a reward for pleading guilty, it's
24     called acceptance of responsibility under the Guidelines, but
25     there is no penalty for failing to plead guilty. And I --

1   this is not quite the same, but I -- conceptually, it seems
2   very similar to me here, is that you are sort of turning it
3   around on itself and you are saying that he should be
4   penalized for failing to plead guilty; not literally plead
5   guilty, I get that, but for failing to do something that he
6   could have done vis-a-vis those later years.  We have
7   discussed it enough.  Move on to something else.

8           MR. McMAHON:  All right.  All right.  Judge, I think
9   also you have to look at -- again, this is not a situation
10  where the Defendant has simply done nothing more than
11  exercised his legal right to go to trial or exercised his
12  legal right to have -- to put us to our burden of proof either
13  at trial or today at sentencing; he has gone beyond that, and
14  what he has done in his sentencing memo is try to shift the
15  blame to other people, or he has tried to say, "oh, this is
16  all the result of mistakes or confusion," and that, for
17  example, his 2006 conduct was an isolated mistake, and that's
18  not what happened here.

19          As the Court has already found --

20          THE COURT:  Could you tell me where he says that in
21  his -- you've said that, but -- and you have said that in your
22  brief.  Tell me where exactly in Mr. Meringolo's memo, where
23  he says, "my client, my client has an excuse or an explanation
24  here.  This is all about what other people did, it's not him
25  and he is not responsible for this."  I'm just curious where

 1    he says that.

 2            MR. McMAHON:  If you, if you want, I can go through

 3    it and find it.

 4            THE COURT:  Well, because I don't think it says

 5    that, you see.  Does he, does he say that there was sloppy

 6    recordkeeping, that there was -- there were people at the

 7    company who didn't know what they were doing, including Mr.

 8    Marino, obviously?

 9            That's true.  That's all true.  But at the same

10    time, he I don't think says, you know, "Judge, you ought to go

11    easy on me because the years for which I was convicted,

12    really, that wasn't my fault."

13            Some of the people that wrote letters on his behalf

14    did say that and they are flat-out wrong.  Of course it was

15    his fault and it's ridiculous to say otherwise.  But, see, I

16    don't think he says that, and maybe you are confusing what

17    some of his letter writers said with what Mr. Meringolo said.

18            I suppose you can argue that by enclosing letters

19    which essentially say, "there is no way Matthew was guilty," I

20    suppose you could make the argument that he is adopting that,

21    and, therefore, he is saying, "I'm not guilty.  I did nothing

22    wrong.  It's everybody else's fault, it's not me," but he

23    doesn't really say that.

24            I would rather he hadn't attached those letters, or

25    if he got letters like that, he might have said to the letter

1    writer, "you know what, the Judge isn't really going to like

2    this, because the Judge thinks he is guilty.  Regardless of

3    what you think, the Judge thinks he is guilty on these, on

4    these points."

5              MR. McMAHON:  Judge, the quote -- when I put

6    "confusion and mistakes" in quotes, I am quoting directly from

7    the Defendant's brief.

8              THE COURT:  But there were -- there was confusion

9    and mistakes, clearly there were.

10              MR. McMAHON:  But that's not -- that doesn't explain

11    what the Defendant did here.

12              THE COURT:  It doesn't --

13              MR. McMAHON:  Your Honor has already found --

14              THE COURT:  It doesn't, it doesn't excuse it, but

15    it's true.  I think there were clearly confusion and mistakes.

16              There's clearly -- there were -- again, I don't

17    remember the minutia of the evidence, but, you know, untimely

18    I suppose, but, you know, this information was available

19    to/presented to the bookkeeper.  What was her name?  Ms.

20    D'Abruzzo.  It was presented to the CPA, the CPA.

21              Ms. D'Abruzzo is definitely not a CPA --

22              MR. McMAHON:  Well, but Your Honor --

23              THE COURT:  -- but Mr. Marino says he was.  He

24    didn't act like one.  So, confusion, mistakes, yes, there were

25    lots of them.

Sue Ghorayeb,  Official Court Reporter

1          MR. McMAHON:  Yes, with respect to 2010 and 2011,

2     that's what Your Honor is talking about.  But I'm talking

3     about the years of conviction, 2007 through '09, and there

4     were, there were no confusion there.

5          The Defendant's conduct didn't result from confusion

6     or mistakes in 2007 through 2009.  Your Honor has already

7     found that.  That's inherent in your verdicts for those

8     counts, for those years, and yet the Defendant has been saying

9     that, "look, this is all a problem I have taken care of.  I

10     have hired a new accountant at Wireless and this isn't going

11     to happen again, Your Honor, because now I have an accountant

12     who is going to handle this thing properly for me."  And what

13     he is saying there is that, "my conduct and what -- my crimes

14     are all the result of mistakes and confusion."

15          THE COURT:  See, again, I agree with you part of the

16     way, but I think you are overstating it, what he says.

17          I mean, he does say that he has tried to correct for

18     this by actually hiring a competent person to deal with these

19     issues.  I have seen this a million times and I know you have

20     too, where people are really good at making money, sometimes

21     hand over foot making money, they are not so good at the back

22     office part of the business and it gets them in trouble.

23          And there is an element -- it's not black and white.

24     There is an element of:  "Well, if I just don't have somebody

25     really good to kinda watch out for what I do, then maybe I can

1      get away with doing things that I really shouldn't be entitled

2      to get away with." So, there is an incentive not to hire

3      somebody good. There is an incentive to have, you know, the

4      niece of, you know, somebody who is clearly incompetent, or if

5      not incompetent, at least, not trained properly and not

6      capable to, you know, to do it the right way. There is almost

7      an incentive to do that, because then that makes it easier for

8      you to say, "well, who knew? I didn't know I was supposed to

9      do these things."

10      So, I mean, I go with you part of the way, but I

11      don't think that what Mr. Meringolo said in his brief, or by

12      extension what his client is saying, is that he is looking to

13      excuse his conduct. He was found guilty.

14      This is a tax case. It's not a theft case, not an

15      embezzlement case. It's a tax case. He underreported his

16      income by a material amount. He did so for those three years

17      knowing exactly what he was doing. I agree with all that. I

18      agree with it. So, none of the -- none of the noise, to the

19      extent there is any noise in there that suggests otherwise, I

20      just reject that out-of-hand, but I don't -- I guess I just

21      don't see it.

22      Unless you can quote me something and I can say,

23      "mm-hmm, now that I see that again, I see that he is really,

24      he is really minimizing his responsibility." Other than kind

25      of saying, well, the tone -- it's really you are saying the

1    tone of the brief is that he is minimizing his responsibility,

2    and I think you could make that argument.  It's not a crazy

3    argument.

4              MR. McMAHON:  I'll adopt that argument, because Your

5    Honor said you would accept it.  But when I quoted those

6    words, I was quoting directly from the brief --

7              THE COURT:  Yes, but --

8              MR. McMAHON:  -- and I don't have a cite.  I can go

9    through the 80 pages if Your Honor wants.

10             THE COURT:  No.  You had time to do it.  The trial

11   was over in January.  You had plenty of time to do it.

12             By the way, just so you know, I adjourned this

13   sentence without -- sentencing date without asking anyone

14   because I received -- and I'm not saying that it's bad that

15   you did this, Mr. Meringolo, but I received this 60-plus-page

16   brief with -- I don't know -- 75 exhibits and -- a few days

17   before the scheduled sentencing date and I just didn't have

18   enough time to do it, because I have 250 other cases.  So, you

19   know, that's all it was.  There was nothing complicated or

20   nefarious about it.  It was just that, "well, gee, I'm going

21   to need more time to review this."

22             But you have had plenty of time to review it.

23             MR. McMAHON:  I have.  But, you know, I can give

24   Your Honor one cite --

25             THE COURT:  All right.

1          MR. McMAHON:  -- one citation, but it relates to the

2     home office deduction, which Your Honor has already ruled is

3     not relevant conduct.

4          THE COURT:  Right.

5          MR. McMAHON:  But in that case -- I didn't know that

6     at the time I wrote it -- the Defendant wrote in his brief,

7     "An isolated" --

8          THE COURT:  Give me a page number, please.

9          MR. McMAHON:  Page 20.

10         THE COURT:  Twenty.

11         MR. McMAHON:  "An isolated mistake in 2006 cannot be

12    considered to be part of his subsequent series of transactions

13    in later years," and that's the best quote I can find right

14    now.  There are others as well that relate directly more to

15    the conduct that Your Honor considered --

16         THE COURT:  Hold on one second.

17         Well, but it does kind of sound like an isolated

18    mistake.  I mean, it's something that happened in 2006, which

19    is a long time ago.  It has nothing to do with not reporting

20    legal fees or fees for other services or taking out money from

21    the company in the form of company-paid personal expenses.

22    That's all in the nature of not reporting income.

23         This is different.  This is a deduction.  It's a

24    one time event, apparently.  I mean, I didn't hear anything

25    about it happening again.  That's the thing.  Let's say it

1    happened again.  Let's say, in 2007, he did the same thing.

2    One plus one equals a lot more than two when it comes to this

3    kind of thing, which is why I thought that, for example, the

4    2006 conduct in failing to report those fees was part of the

5    same course of conduct, because it's the same thing that

6    happened in '07, at least, and in '08 to some extent.

7              But here we do have a one time incident, and, you

8    know, it says here, "An isolated mistake in 2006 cannot be

9    considered to be part of his subsequent series of transactions

10   in later years."  I kinda -- I do agree with that.  I don't

11   think it is a part of his completely different transactions

12   that he was convicted of in later years.

13             MR. McMAHON:  Well, I guess the difference in our

14   thinking is that to make that -- to get that home office

15   deduction, he had to lie to his accountant to get it and lie

16   on his tax return to get it, and that's exactly what he was

17   charged with.

18             THE COURT:  I hear you.

19             MR. McMAHON:  But let me go ahead, thanks to Mr.

20   Kameros, to Page 27 of the Defendant's brief.  He found an

21   additional example here.

22             THE COURT:  Okay.

23             MR. McMAHON:  And I'll -- I won't read -- unless you

24   want me to --

25             THE COURT:  Okay.  What paragraph?  Just give me --

1           MR. McMAHON:  The first full paragraph.

2           THE COURT:  Okay.

3           MR. McMAHON:  So, the fifth line down.

4           THE COURT:  I see it.  Again, you know, that is a

5    bit of a spin, I agree, but it's not really inconsistent with

6    the defense at trial, and I'm reluctant to punish somebody for

7    being, you know, or to pile on and make his sentence worse

8    simply because he repeats part of his defense at the time of

9    the sentencing memorandum.

10          He is not required at this point -- it might have

11   helped him if he had actually admitted that his conduct was

12   willful; that would have -- I think he might have gotten,

13   might have gotten, not necessarily, might have gotten two

14   levels off for acceptance of responsibility.  But I think it's

15   true that "the use of personal credit cards caused confusion

16   on multiple levels."  That's true.  "Resulted in incorrect

17   bookkeeping entries."  It was his use of personal credit

18   cards.  He is not saying that it was somebody else's.

19          "My use of personal credit cards resulted in

20   incorrect bookkeeping entries" -- that's correct -- "incorrect

21   attribution on tax returns" -- he might have added, "which I

22   knew about and should have corrected," but, nonetheless, it's

23   true that it resulted in the incorrect attribution on tax

24   returns -- "and insufficient payment of taxes."

25          So, again, I see your point, but to me, this is,

1    this is spin.  It's not, it's not quite as serious as you make

2    it out to be, and it's really largely consistent with what his

3    defense was at trial, so I'm not offended by it.  I rejected

4    it at trial, but that doesn't mean I'm going to say, "I told

5    you you were wrong, now I'm going to punish you even more for

6    challenging my ruling by repeating what you said before."  I'm

7    not going to do that.

8            MR. McMAHON:  But that's not what I'm asking Your

9    Honor to do.

10           What I'm asking Your Honor to do with respect to all

11    of this, as well as the other conduct which Your Honor has not

12    considered today, for example, the thefts -- what I contend

13    are the thefts from Mr. Boemio, what I contend are the thefts

14    from Mr. Blidy, this all goes to the history and

15    characteristics of this Defendant under 3553(a), and therefore

16    it is fair for the Court to consider it and the Court under

17    3553(a) has to consider it.  And the reason why it's important

18    here is because it goes to the risk of recidivism, among other

19    things, in that the Defendant had made a big point that he is

20    not going to be a recidivist and that the statistics of

21    recidivism in tax cases are relatively low.  That's fine for

22    statistics, but Your Honor has to consider this Defendant

23    under these circumstances and the evidence that you have in

24    front of you.

25           THE COURT:  All right.  Let me stop you right there.

1          You are entitled to make that argument.  I'm not

2   saying it's a frivolous argument.  But, again, just take a

3   breath for a second.  Do you really think that there is a

4   likelihood of recidivism for this Defendant, this Defendant?

5          MR. McMAHON:  Based on everything I know about him,

6   yes.

7          THE COURT:  Okay.  Fair enough.  That's your

8   position.  What else do you have?

9          MR. McMAHON:  That's it, Your Honor.  Unless you

10  have any questions, I'll --

11         THE COURT:  No.  As you can see, I already had a

12  bunch of questions.  I don't want to make it -- I mean, I have

13  read what you have submitted.  By the way, the briefing was

14  excellent.  I'm not criticizing it.  It was a little bit long,

15  but there was nothing wrong with it, and I appreciate the fact

16  that both of you are doing your utmost to represent your

17  respective clients and your positions in the case.

18         Okay.  Thank you, Mr. McMahon.

19         Mr. Meringolo, do you wish to be heard?

20         MR. MERINGOLO:  Yes, Your Honor.  Your Honor, my

21  client is requesting the Court go with the recommendation by

22  Probation and issue a non-incarceratory sentence.  He stands

23  before this Court.  He is 37-years-old.

24         Your Honor, when the first subpoena -- when he first

25  was approached by the Government in 2010, he went.  As the

1      individual testified, he was forthright.  Throughout this

2      trial, everyone testified that he was a decent man and he is a

3      decent man despite what the Government says.

4              The evidence regarding that issue, as a 32-year-old

5      man and now he is 37, it was five years.  This investigation

6      was five years, Your Honor.  We complied with every subpoena.

7      We gave the Government everything.  In our opinion, during

8      that period of time, we had nothing to hide.

9              He is guilty of the three charges in this case.  We

10     accept it.  He accepts the Court's ruling.  He has paid back

11     the money.  He has actually paid more than what he owes, which

12     he will get a return.

13             In 2010 and 2011, I understand the Government's

14     arguments and I understand that it would have been more

15     appropriate just to write the check.  Meeting with the

16     accountant regarding those two years, it's going to be

17     substantially less than what was presented at trial than what

18     in fact it was, and maybe it is my fault for him not writing

19     the check, but he --

20             THE COURT:  I'm not holding it against you.

21             MR. MERINGOLO:  No.  I understand that.

22             THE COURT:  I think I made that crystal clear.

23             MR. MERINGOLO:  No.  I understand, Your Honor.

24             THE COURT:  So you don't really have to fight that

25     point.

1           MR. MERINGOLO:  Looking back, if I had another case
2     like this and the gentleman had the money, I would make him
3     write the check.  There is no doubt about it.  But it's not
4     what the Government contends the loss is for 2010 and 2011.
5     We have been waiting for the IRS to get back to us.  The
6     accountant has been in touch with the IRS to get a specific
7     number, and he is going -- as soon as he gets that number, he
8     is going to pay the number.  So, he is not saying, "I'm not
9     paying the IRS."  He has in fact paid three years, even he
10    paid '06 also before the sentencing date.

11          So, I don't believe, Your Honor, at -- one, that the
12    Government, you know, even though that's their argument, this
13    individual has accepted responsibility.  He has paid what he
14    has paid and he intends to pay even more.

15          THE COURT:  Let me just say, Mr. Meringolo,
16    acceptance of responsibility, while theoretically applicable
17    to someone who goes to trial, putting the Government's burden
18    of proof -- putting the Government through its burden of
19    proof, is possible.  In other words, it's possible to get
20    that.  The Guidelines do say that.

21          I have been doing this now, as a prosecutor, defense
22    lawyer and Judge, for 26 years.  I haven't seen it happen
23    once.  I guess it's possible, but I haven't seen it happen
24    once, and the reason is that you get credit for true
25    acceptance of responsibility.  You get a reward for pleading

1    guilty.  You don't have to plead guilty.  I'm not saying you
2    have to plead guilty, but you do get rewarded for that.
3    That's the way we operate.  It's the tradition that we have
4    operated under for several hundred years.  It's the way we do
5    things.  But he didn't, he didn't do that here.  He opted to
6    go to trial, his absolute right.  I'm not criticizing him for
7    that, but I'm not going to reward him now for saying, "well,
8    okay, I paid my taxes.  I'm trying to do the best that I can."
9            I mean, I'm going to -- it's relevant.  I'm not
10    saying it's not relevant.  It is relevant, it is relevant.
11    So, everything you are saying is relevant, but it's not enough
12    to get acceptance of responsibility points.
13            So, if you are using the term acceptance of
14    responsibility in sort of a nontechnical way, in other words,
15    you are saying, "well, putting aside the question of whether
16    he gets two points under 3E1.1" -- is that right -- "3E1.1,
17    just generically, he is accepting responsibility by doing what
18    he is doing now," and you are welcome to make that argument,
19    but I'm not going to change my position on the two points.
20            MR. MERINGOLO:  I'm not asking you to.  I just was
21    saying it in theory of him paying the taxes, that he is not
22    running from paying anything.
23            The two other things that I'll -- I know the brief
24    was very long and I know Your Honor has read the brief.  So
25    I'm just going to --

1            THE COURT:  I'm not being critical of you for that,
2       just so --
3            MR. MERINGOLO:  No, no.  I understand.  I mean, I
4       don't want to reiterate everything and waste everyone's time.
5            THE COURT:  All right.
6            MR. MERINGOLO:  But I think when we are going to
7       sentence my client, I think if we look at his entire family
8       circumstances, preparing for the trial, a week before the
9       trial he loses his aunt.  During the trial, he loses his
10      grandmother.  His father is terminally ill.  I mean there's --
11      you know, there's no way of his father making a rebound and
12      living the next twenty years.  He is bedridden in Florida
13      right now.
14           THE COURT:  I noticed he is not here.  So, is that
15      why?
16           MR. MERINGOLO:  He could not make the trip.  He had
17      a very extensive operation.  As of this morning, he was
18      feeling good.  His mother is by his side.
19           So, Mr. Libous, you know, this isn't a large family.
20      He is, in essence, the man of the family now.  He has a
21      brother and he also has a wife who is in the courtroom with
22      many of his friends from the church, college friends, and
23      lifelong friends.  You know, to say that this man is going to
24      come back and commit more crimes I think, you know, in my
25      opinion -- and I've been doing it quite, quite a while -- I

1    don't believe that he is, and I think now he has a one-year-
2    old son.  His son was one last week.

3            And I think when you look at the conduct, even the
4    conduct that was charged, you know, 2010 and 2011, but then
5    you look at what Mr. Libous has done after that:  He met his
6    wife.  He got married.  He has a kid.  He is not with Mr.
7    Boemio.  He is not with Mr. Marino.  He has changed his life
8    and I think that's, that's evident.  It's -- that's clear.
9    The evidence is there that he has changed his life.

10           He is not looking to commit crimes anymore.  He has
11   a one-year-old son.  I'm sure he hopes that he has other
12   children.  And just when you look at all of that and what he
13   does with the community, and some of those letters were really
14   compelling, Your Honor, on how he would help people, and he is
15   doing great financially with this company that he built.  He
16   is doing great, but he is not only giving money, he spends
17   time.  He meets people, he helps people, and, you know, I
18   don't know him.  I know him for the last five years and I've
19   seen time and time again that he has helped people, you know,
20   and I just think that should be -- that should be taken into
21   consideration.

22           And I know the Guidelines is 15 to 21 months, but
23   I'm respectfully requesting the Court give him a time served
24   sentence.  I'm of the hope that he will not be back.  He can
25   deal with his family issues and he can help his company, who

1    has in between 17 and 25 employees relying on him, and I think

2    that that's indicative of what we request from the defense.

3    Thank you, Your Honor.

4              THE COURT:  Thank you, Mr. Meringolo, and let me

5    just say again that I -- I think I said this at the trial, but

6    I do appreciate the excellent lawyering in this case.

7              I will say that sometimes, you know, of course,

8    these things can get emotional and stressful, and sometimes

9    people could take extreme positions, but I'm not offended by

10   it.  I think that the lawyers in this case have done a

11   terrific job on both sides.  So, let me say that before we go

12   any further.

13             Mr. Libous, do you have anything you would like to

14   say or any information you would like to present before I

15   impose sentence?

16             THE DEFENDANT:  Yes, Your Honor.  Your Honor, I'm

17   here because of my actions and nobody else's, and, and I'm

18   sorry to you and I thank you for your time, thanks for the

19   rest of the Court's time.  I'm sorry.  I'm sorry as far as

20   being -- I was an attorney, you know.  I'm sorry that I wasn't

21   more careful.  I'm sorry I didn't, you know, claim those fees.

22   I'm sorry.  I should've, I should've done better.  Mostly, I

23   mean --

24             THE COURT:  Take your time.  It's all right.

25             THE DEFENDANT:  I mean it's -- I can't tell Your

1    Honor how --

2         THE COURT:  You can turn around.

3         THE DEFENDANT:  No.  I mean I can't, I can't look at

4    the people here.

5         THE COURT:  Okay.  I get it.

6         THE DEFENDANT:  I mean, I can hear the Government

7    say the worst things about me and it doesn't affect me, but I

8    just see the people behind me and see how much they love me

9    and support me and that's what, that's what gets me.

10        I mean the people that are right in front of you,

11   they are related to me, and they supported my wife.  They

12   supported me.  I mean, when this was all going on, I mean I

13   was upfront with my wife on what was happening.  She didn't

14   know anything and she still chose me, you know, over the

15   circumstance, and I just think it's, it's just like God has

16   put me in this position now where I'm being able to be used as

17   a vessel.  I'm not looking out for myself anymore.  I look out

18   for -- this has been going on for the past four years now.

19   When it's given to me, I give, and what it means is, you know,

20   I'm a follower of Jesus like, you know.  For the last four

21   years, I tried to live my life like he would.  It's hard, it's

22   not easy.

23        He says to love everybody.  He doesn't say you have

24   to like everybody, but I do my best to love everyone, and

25   especially my family.  And just to think like my son, who

1    wasn't even a thought when all this went on, is now going to

2    possibly not have his father, that's, that's the hardest thing

3    for me to accept, it's like -- you know. And, again, it's my

4    fault, so I have no one to blame.

5              I just -- I truly am sorry.  I really am.  I'm sorry

6    for -- to bring everyone, the people who love me, to bring

7    them through this, because I know they feel pain too.  They

8    see what it's doing.  You know, it's stressful, as you know.

9    I mean, it's just a very stressful situation.  This has been

10   going on for five years.  At the same time, it's, it's

11   really -- it's a major relief to be in front of you right now

12   just to know that it's over, and whatever my journey is from

13   here on out, I mean, I'm going to accept it.  I'm under your

14   authority and I accept it.  I just -- I just want everybody

15   here to know how sorry and how thankful I am.

16             THE COURT:  Okay.  Have a seat.  And, again, let me

17   just apologize to you for adjourning the sentence, because I

18   know from personal experience that people in your position are

19   focussed on a particular date as being the date on which they

20   hope something good is going to happen, but they really just

21   want it to be over one way or the other, and I did not lightly

22   adjourn the sentence, but I didn't think it was fair to you or

23   to the Government for that matter to not devote a substantial

24   time and attention to the many issues, some of which were

25   complicated, that were presented in your lawyer's brief and

1    then, of course, in the Government's brief.  So, anyway, thank
2    you, Mr. Libous.

3         Now, I do not believe in keeping a defendant in
4    suspense about what sentence I intend to impose.  So, I'm
5    going to tell you upfront what that sentence is and then I'm
6    going to explain my reasoning, which is required under the law
7    and you are entitled to hear it as well, but even if you don't
8    hear it, I have to do it.  So, I'm going to do both of those
9    things.

10        But let me say first that in deciding the
11   appropriate sentence in this case, I have considered all of
12   the statutory factors set forth in 18, United States Code,
13   Section 3553(a).  Having done so, I believe that a sentence of
14   six months imprisonment, to be followed by one year of
15   supervised release on each count to run concurrently, as well
16   as a $25,000 fine and 100 hours of community service as a
17   condition of supervised release is sufficient but not greater
18   than necessary to comply with the purposes of sentencing set
19   forth in the statute.

20        My reasoning is as follows:  The Defendant has been
21   convicted of filing a false personal income tax return for
22   each of the years 2007, 2008 and 2009.

23        Starting in 2006 and continuing through 2009, which
24   is a four-year period, the Defendant failed to report income
25   he received as an attorney and as a partner in a company that

1    builds and services cell phone towers.  Including 2006, he

2    underreported his income by approximately a $100,000 or maybe

3    a little bit less than that, but approximately a $100,000,

4    resulting in a total tax loss of about $38,000.

5            Mr. Libous is both an attorney, and he was at the

6    time of the offenses, and has now -- has since become a

7    successful businessman.  He certainly knew what he was doing

8    at the time he committed these offenses both in terms of the

9    fees he earned but chose not to report and as to the personal

10   expenses he ran through his business.

11           These are serious crimes.  Everybody, everybody has

12   to pay taxes and the nation's tax system depends on those

13   taxes, and the nation's defense, the nation's infrastructure,

14   everything that we do depends on taxpayers accurately

15   reporting their income and taxes.  Mr. Libous knew that and he

16   nonetheless chose to file a series of materially false tax

17   returns.  At the same time, the offense was not a violent

18   crime and the Defendant has no prior criminal record.

19           It's also clear from the dozens of letters that I

20   received that Mr. Libous is a compassionate and kind person

21   who is deeply involved in many charitable activities

22   particularly at his church.  There is no question that he is

23   actively involved in his church's outreach to those in the

24   community in need of assistance, including the homeless and

25   people struggling with drug addiction and alcoholism.  He has

1   even rendered personal assistance on a number of occasions to

2   elderly victims of Hurricane Sandy.  So, I have no doubt that

3   Mr. Libous has many fine personal qualities, which are

4   certainly relevant to sentencing.

5           Mr. Libous also clearly enjoys a great deal of

6   emotional support from his family and friends, as well as his

7   employees.  And I want to thank you all for being here today.

8   I have read your letters, every one of them, and I can see

9   that they were written from the heart, and the fact that you

10  are here today certainly is taken note of by me and is of

11  great importance to Mr. Libous, of course.  So, thank you for

12  being here.

13          Mr. Libous is gainfully employed running a

14  successful cell town construction and servicing business --

15  cell tower and construction -- I'm sorry, successful cell

16  tower construction and servicing business.  That business has

17  somewhere between 15 and 25 employees and certainly would be

18  adversely affected, although, in my view, not extraordinarily

19  adversely affected, by his incarceration even for a short

20  time.  This is a mitigating factor for sentencing.

21          Mr. Libous has paid his taxes, as well as penalties

22  and interest, for the years 2006 through 2009.  This is a

23  substantial mitigating factor for sentencing.

24          At the same time, I do not believe that he has truly

25  accepted responsibility for his crimes, because he has never

1    admitted he acted willfully in filing a series of materially

2    false tax returns, and this is an important fact, because

3    while, as I said earlier, I would certainly never punish

4    someone for exercising his constitutional right to a trial, at

5    the same time, I'm not willing to give a significant benefit

6    to someone who has not actually accepted responsibility in the

7    legal sense for what he has done just because he has now filed

8    amended returns and paid his taxes.

9            I am aware that Mr. Libous's father is suffering

10    from a very serious illness and that any period of

11    incarceration will be a hardship for the senior Mr. Libous as

12    well as the rest of the Defendant's family, but a jail

13    sentence in a case like this is absolutely necessary,

14    principally because of the need to promote general deterrence.

15            There is no question in my mind that jail sentences

16    in tax cases deter similarly situated people from cheating on

17    their taxes.  This is probably an area in which general

18    deterrence is the most relevant.  Of all of the different

19    types of federal crimes, this might be most pertinent and

20    relevant in the area of tax crimes.  The knowledge that if

21    caught you will go to jail certainly makes people think that

22    tax fraud is just not worth it.

23            Here, after considering the nature and circumstances

24    of the offense, as well as the history and characteristics of

25    the Defendant, the sentence I intend to impose, as I said, is

1    six months in jail, $25,000 fine, a hundred hours of community

2    service as a condition of supervised release, is a fair and

3    appropriate sentence, and I believe it is sufficient but not

4    greater than necessary to reflect the seriousness of the

5    offense, promote respect for the law, provide just punishment

6    for the offense and afford adequate deterrence to criminal

7    conduct.

8              I will add that I would impose the same sentence

9    whether the guideline range was 15 to 21 months at Level 14 or

10   10 to 16 months at Level 12.  So, even if I gave him

11   acceptance points, he will be at 10 to 16 months, and either

12   way I would impose the same sentence, because, as I have said

13   before, is that the Defendant's conduct in committing these

14   crimes is the most important thing, and it's so important that

15   I would impose the same sentence even if the guideline range

16   was based on Offense Level 12.

17             The bottom line is that the Defendant's admirable

18   personal characteristics, the fact that he has now paid his

19   taxes for the years '06 through '09, and the fact that his

20   business and thus his employees will suffer if he is

21   incarcerated, his lack of a prior criminal record, as well as

22   the fact that I am imposing a substantial fine, in combination

23   do warrant a downward variance, but these factors do not

24   warrant a non-jail sentence given the nature of the offense,

25   which, after all, is the most important sentencing factor.

1          Does either counsel know of any legal reason why the

2   sentence should not be imposed as stated?  Mr. McMahon.

3          MR. McMAHON:  No, Your Honor.

4          THE COURT:  Mr. Meringolo.

5          MR. MERINGOLO:  No, Your Honor.

6          THE COURT:  Mr. Libous, please stand.

7          Mr. Libous, it is the judgment of this Court that

8   you be committed to the custody of the United States Bureau of

9   Prisons for a total term of six months, to be followed by one

10  year of supervised release.  The standard conditions of

11  supervised release one to 13 shall apply.

12         The following mandatory conditions shall also

13  apply -- they are on Page 26 of the Presentence Report -- as

14  follows, these are mandatory conditions:

15         The Defendant shall not commit another federal,

16  state, or local crime.

17         The Defendant shall not illegally possess a

18  controlled substance.

19         The Defendant shall not possess a firearm or

20  destructive device.

21         The Defendant shall refrain from any unlawful use of

22  a controlled substance.

23         The Defendant shall refrain from any unlawful use of

24  a controlled substance.  I'm sorry, I just said that.

25         The Defendant shall submit to one drug testing

Sue Ghorayeb,  Official Court Reporter

1   within 15 days of placement on probation or supervised release

2   and at least two unscheduled drug tests thereafter, as

3   directed by the Probation Officer.

4           The Defendant shall cooperate in the collection of

5   DNA, as directed by the Probation Officer.

6           In addition, the following special conditions shall

7   apply:  One, the Defendant shall perform 100 hours of

8   community service, as directed by the Probation Officer.

9           Two, the Defendant shall provide the Probation

10  Officer with access to any requested financial information.

11          Three, the Defendant shall obey the tax laws.

12          Now, the proposed language from the Probation

13  Officer says, "and comply with the directives of the IRS."

14  I'm not going to include that explicitly.  I think the

15  Defendant shall obey the tax laws is sufficient, because I

16  don't want to make it sound like if the IRS demanded that he

17  do something that was clearly inappropriate, that he had to

18  comply with it.  So, I'm not going to include that.  I'm sure

19  they wouldn't do that, but I don't want to leave open that

20  possibility.

21          The Defendant is to report to the nearest Probation

22  Office within 72 hours of release from custody.

23          If the Defendant is sentenced to any period of

24  supervision -- and, of course, he is -- it is recommended that

25  the Defendant be supervised by his district of residence.

1            I am imposing a fine in the amount of $25,000, which

2     is due immediately.  That, by the way, is roughly the amount

3     of unpaid taxes for the three years of conviction, 2007, 2008,

4     2009.  I think it's appropriate to impose that fine.

5            Restitution is not applicable here.

6            I am imposing the mandatory special assessment of

7     $100 per count, for a total of $300, which is due immediately,

8     and I believe the Government is entitled to costs of

9     prosecution, although, I'm not going to order the Defendant to

10    pay for two copies of the transcript.  It seems to me one is

11    enough.

12           Your affidavit reflects that you want me to order

13    him to pay the costs of prosecution for the original plus a

14    copy.  Why would I do that?

15           Is that what you are asking for?

16           MR. McMAHON:  That is what I asked for, but I won't

17    object if it's one.

18           THE COURT:  You won't object if we take out the

19    copy?

20           MR. McMAHON:  Yes.

21           THE COURT:  All right.  So, the cost of prosecution

22    is $3075.30.

23           The foregoing constitutes the sentence of the Court.

24           You can have a seat, sir.

25           You have a right to appeal your conviction and your

Sue Ghorayeb,  Official Court Reporter

1    sentence.  If you are unable to pay the costs of an appeal,

2    you may apply for leave to appeal without payment of costs.

3    The Notice of Appeal must be filed within 14 days of the entry

4    of judgment.  Therefore, if you do wish to appeal, you must

5    advise your attorney to prepare and file a Notice of Appeal

6    immediately, or if you request, the clerk will immediately

7    prepare and file a Notice of Appeal on your behalf.

8              There is an underlying Indictment here, right, that

9    needs to be dismissed?

10             MR. McMAHON:  Yes.

11             THE COURT:  Are you moving to dismiss it?

12             MR. McMAHON:  I so move.

13             THE COURT:  Any objection?

14             MR. MERINGOLO:  No objection, Your Honor.

15             THE COURT:  The underlying Indictment is dismissed.

16             Are there any recommendations that you would like me

17   to include in the judgment for the BOP?

18             MR. MERINGOLO:  Yes, Your Honor.  We would like to

19   recommend Fort Dix.

20             THE COURT:  Okay.  There are several different

21   facilities there.  Is there one particular one that --

22             MR. MERINGOLO:  A low, a low security.

23             THE COURT:  My understanding is that it's really --

24   Fort Dix is not just one institution.  There are several

25   institutions.  There are at least two, maybe three, that are

1    meaningfully separated.  But I'll include that in the

2    judgment.  I have no problem doing that.

3              Anything else?

4              MR. MERINGOLO:  If he can self-surrender, Your

5    Honor.

6              THE COURT:  Any objection to that?

7              MR. McMAHON:  No.

8              THE COURT:  All right.  Well, we normally do 45

9    days, which seems like it's enough time for BOP to do its work

10   and figure out where someone is going to go.  I will tell you

11   that my recommendation for Fort Dix is not binding on the

12   Bureau of Prisons.  Your client should know that.

13             MR. MERINGOLO:  Yes.

14             THE COURT:  Especially for relatively short

15   sentences, they may not do that.  They may want him to serve

16   it at the MDC in Brooklyn, but I'll recommend it.  It's not an

17   unreasonable request, I'll recommend it, but don't assume that

18   you are going to get it, that's my only point.

19             So, 45 days from today I think is July 2nd, 2015.

20             Yes, July 2nd, 2015, that's 45 days, and I think

21   2:00 o'clock on that day.  Is that what the judgment will say?

22             So, you are going to surrender to the institution to

23   be designated by the Bureau of Prisons by 2:00 p.m., on July

24   2nd, 2015, unless that date is extended by me.  You can't just

25   not show up and you'll get notice.  If you don't get notice at

1   some point, you will let me know, and, of course, I would

2   extend it.  I mean, I'm not going to leave you hanging.

3            But go ahead, Mr. Meringolo.

4            MR. MERINGOLO:  Your Honor, my client asked me if he

5   could, if he could extend that until after his father's trial,

6   so he could be with his father during the trial.

7            THE COURT:  Well, if it wasn't his father, I would

8   probably say no, but it is his father, that makes it slightly

9   different.  The date of that trial is July 13th, right.

10           All right.  I'm willing to do that.  So, let's see,

11  July 13th.  How about the week of -- how about July 31st?

12           MR. MERINGOLO:  Thank you much, Judge.

13           THE COURT:  Is that sufficient?

14           All right.  So, the surrender date is July 31st,

15  2015, at 2:00 p.m.  That's a little longer than usual, but I

16  think under the circumstances it's a reasonable request.  Any

17  objections to bail being continued as previously set?

18           MR. McMAHON:  No, Your Honor.

19           THE COURT:  All right.  Then that's what I'll do.

20           Mr. Libous, if for some reason you are asked to give

21  a drug test or give a urine sample for a drug test, you will

22  do so and you will not -- and I'm not saying that you did this

23  previously, because the evidence is inconclusive, as I said

24  earlier -- you will not do anything to tamper with or dilute

25  that sample.  I'm not suggesting that you did, but I'm just

1    giving you fair warning that if I found out that something

2    like that happened, it would result in an immediate revocation

3    of your bail, notwithstanding your father's trial; do you

4    understand that?

5              THE DEFENDANT:  Understood, yes.

6              THE COURT:  Okay.  Anything further?

7              MR. McMAHON:  No, Your Honor.  Thank you.

8              THE COURT:  All right.

9              MR. MERINGOLO:  Nothing from the defense, Your

10   Honor.  Thank you, Your Honor.

11             THE COURT:  All right.  Thank you all.  Have a good

12   day.

13             (Case concluded)

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 18

99T8HOLS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4          v.               09 Cr. 470 (VM)

5   ERIC HOLZER,

6            Defendant.

7   ------------------------------x

8                       September 29, 2009
                       4:00 p.m.
9

10  Before:

               HON. VICTOR MARRERO
11

                       District Judge
12

                 APPEARANCES
13

14  PREET BHARARA
       United States Attorney for the
       Southern District of New York
15  JOAN LOUGHNANE
       Assistant United States Attorney
16

    PAUL SHECHTMAN
17      Attorney for Defendant

18

19

20

21

22

23

24

25

1      THE COURT:  This is a proceeding in the matter of

2  United States v. Holzer, docket number 09 Cr. 0470.

3      Counsel, please enter your appearances for the record.

4      MS. LOUGHNANE:  Joan Loughnane for the government.

5  Good afternoon, your Honor.

6      MR. SHECHTMAN:  Paul Shechtman for Mr. Holzer.  Good

7  afternoon, your Honor.

8      THE COURT:  Good afternoon.

9      I will note for the record that the defendant is

10  present in the courtroom seated next to his attorney.

11      I have read and reviewed the presentence investigation

12  report, dated September 3, 2009, which was prepared in

13  connection with today's sentencing of Mr. Holzer.  I have also

14  read and reviewed Mr. Holzer's sentencing submission, dated

15  September 4, 2009, including the many letters submitted on Mr.

16  Holzer's behalf by his family, friends, and colleagues.

17      Ms. Loughnane, has the government read and reviewed

18  the presentence report?

19      MS. LOUGHNANE:  We have, your Honor.

20      THE COURT:  Does the government have any objections to

21  the report to raise at this point?

22      MS. LOUGHNANE:  No, your Honor.

23      THE COURT:  Mr. Shechtman, have you read and reviewed

24  the presentence report?

25      MR. SHECHTMAN:  We have, your Honor.

1        THE COURT:  Have you had an opportunity to discuss it

2   with Mr. Holzer?

3        MR. SHECHTMAN:  Yes, your Honor.

4        THE COURT:  Do you have any objections to the report

5   to raise at this point?

6        MR. SHECHTMAN:  No, your Honor.

7        THE COURT:  Mr. Holzer, please rise.

8        Mr. Holzer, have you read and reviewed the presentence

9   report?

10        THE DEFENDANT:  I have, your Honor.

11        THE COURT:  Have you discussed it with your attorney?

12        THE DEFENDANT:  I have, your Honor.

13        THE COURT:  On May 7, 2009, Mr. Holzer allocuted

14   before Magistrate Judge Debra Freeman to Counts One and Two of

15   information 09 Cr. 0470.  Count One charged Mr. Holzer with

16   conspiracy to commit securities fraud, in violation of 18

17   U.S.C., Section 371, and Count Two charged Mr. Holzer with

18   securities fraud, in violation of 15 U.S.C., Sections 78j(b)

19   and 78ff, 17 C.F.R., Sections 140.10b-5 and 140.10b-5-2, and 18

20   U.S.C., Section 2.

21        The Court, by order dated September 28, 2009,

22   determined that Mr. Holzer had entered a plea of guilty

23   voluntarily and knowingly and that there was a factual basis

24   for the guilty plea and accepted the defendant's guilty plea.

25        The Court now reiterates its acceptance of the

1   defendant's guilty plea.

2           Ms. Loughnane, does the government have any comments

3   or motions for the Court's consideration in connection with

4   sentencing?

5           MS. LOUGHNANE:  Briefly, your Honor.

6           The government is seeking a guideline sentence in this

7   case, and we believe a guideline sentence is appropriate under

8   3553(a), and I wanted to direct the Court to a couple of

9   reasons that we think that is so, and, in particular, address

10  Mr. Shechtman's letter, which I received this morning, which

11  points out a sentence that was imposed on another defendant in

12  a related case, Frederick Bowers.

13          3553(a) points the Court, of course, to the nature and

14  characteristics of the defendant and the offense, and Mr.

15  Shechtman wrote to the Court because Frederick Bowers received

16  a sentence of probation in another related case.  Mr. Bowers

17  received information from the same tipper as Mr. Holzer.  And

18  he points out that the Court is to avoid unwarranted sentencing

19  disparities among similarly situated defendants.  But the

20  government does not believe Mr. Holzer and Mr. Bowers are

21  similarly situated in a couple of important respects.

22          Mr. Bowers never traded on the inside information he

23  received personally.  He never traded for his own account or

24  his own benefit.  He passed that information on to a client of

25  his, only a single client, and that was the extent of his

1    involvement in the insider trading.  Mr. Holzer was involved in

2    trading for his own benefit, based on the inside information,

3    at least on two separate occasions that are set forth in the

4    information, and he also, as is clear from the presentence

5    report, involved a relative in the trading on those deals.

6          Another important fact for the Court to consider,

7    particularly if you're looking at the Bowers sentence, is that

8    Bowers stopped of his own accord completely.  He stopped

9    because he grew uncomfortable with what he was involved in, and

10    there was really no dispute as to that.  Mr. Holzer stopped

11    because his name appeared on a watch list and it therefore

12    became clear that he was in serious danger of getting caught.

13    It's only for that reason that his conduct stopped.

14          So those are two very important differences between

15    Mr. Bowers and Mr. Holzer.  We think the Court should keep

16    those in mind when you sentence him.

17          Reflecting that, probation recommended a sentence of

18    probation for Mr. Bowers, and, in fact, the sentence that Judge

19    Daniels imposed was more severe than what probation

20    recommended.  The probation department had recommended simply

21    probation.  In fact, Judge Daniels imposed a sentence of

22    probation with 2,000 hours of community service, which is

23    roughly equivalent to a year of 40-hour weeks of service.  So

24    Judge Daniels imposed more than what probation requested.

25          In this case, and in the case before your Honor,

1    probation is recommending a guideline sentence, which is 12

2    months and a day, which is within the 12 to 18 month guideline

3    sentence that the parties have agreed is the appropriate

4    calculation.

5          The last thing I guess I would point out is that your

6    Honor has recognized in other cases, and even in a sentencing

7    earlier today, that it's important for your sentence to reflect

8    the severity of the crime, to promote respect for the law, but

9    also to consider the impact of the crime on the general social

10   order, and for all of those reasons, as well as the nature and

11   characteristics of this defendant and his offense, we believe a

12   guideline sentence is appropriate in this case.

13         THE COURT:  Thank you.

14         Mr. Shechtman, do you have any additional comments

15   with regards to sentencing?

16         MR. SHECHTMAN:  I do, Judge.  I spoke to your law

17   clerk about Cheryl Horowtiz speaking briefly, literally for a

18   minute, and if your Honor is open to that possibility, she

19   would very much like to do it.  I think you will find her

20   remarks both short and heartfelt, but if not, I am happy to

21   proceed.

22         THE COURT:  We know that that individual is among

23   those who wrote a letter.  If you feel strongly that something

24   further said would enhance the record, I will give her one

25   minute.

1          MR. SHECHTMAN:  I will take it, your Honor, just

2     because I think her words will be meaningful.

3          MS. HOROWITZ:  Good afternoon.  Thank you.

4          In 2000, I was diagnosed with colon cancer, Crohn's

5     disease and proctitis.  It was a triple whammy.  My career as a

6     dancer came to a halt.  My health problems soon became

7     financial problems with mounting medical bills and tax issues.

8     Buried in debt, with letters piling up from insurance companies

9     and tax authorities, I turned to Eric Holzer, a friend, for

10    help.  Eric spent hours on the phone working out payment plans.

11    He wrote numerous letters on my behalf and he negotiated for

12    me.  He was my guardian angel.  He never made me feel

13    uncomfortable.  He talked me through everything.  He took my

14    phone calls late at night and on the weekends, and he made me

15    feel as if I was a high paying client at his firm, although he

16    was paid nothing.  Even when I offered him the smallest amount

17    of money he told me not to worry.

18         I am here today to speak for Eric because of all he

19    has done and meant to me.  Many of our friends will tell you

20    similar stories, and when I heard Eric was arrested I was

21    shocked.  We all were.  I understand Eric made a serious

22    mistake, but Eric Holzer saved my life.  I have trusted him for

23    years and I will continue to do so.  I pray that you will weigh

24    his good deeds and character when sentencing him.

25         Thank you.

1          THE COURT:  Thank you.

2          Mr. Shechtman.

3          MR. SHECHTMAN:  Judge Marrero, I stand here with some

4     temerity.  Your Honor has written several times in recent

5     months about sentencing in so-called white-collar cases, and

6     indeed, your Honor spoke about it again today.  This, I

7     suppose, is a white-collar case, but I believe it's different

8     from the ones your Honor has written about.

9          I start with Eric Holzer's crime, for that is what

10    brings us here.  On two occasions in 2005 Eric knowingly traded

11    on inside information obtained from his then close friend Matt

12    Devlin, information that Devlin had gleaned from Devlin's wife.

13    I wrote in my sentencing letter, and I firmly believe, that

14    this case is at the perimeter of 10b-5 law and not at its core.

15    The fiduciary duty breached here was a husband's duty to his

16    wife.  I repeat that point today.

17         In doing so, I do not mean to suggest of course that

18    Eric is not guilty of insider trading.  I agree completely with

19    the law as it was set forth to you in the government's recent

20    memorandum.  Rather, I hope to give the Court some

21    understanding of why it was that Eric dropped his guard and did

22    what he did.  Eric saw a tip from Devlin as one step removed

23    from a tip overheard in a bar or at a party.  It was not a tip

24    based on information from Lehman Brothers where Devlin worked

25    or Paul Hastings where Eric worked.  It was one step removed,

1   but it was a criminal step.

2          Judge, as you know, Eric stopped his criminal conduct

3   in December 2005 when his name appeared on a watch list at

4   Devlin's wife's firm.  The government has characterized it

5   today as that he was caught.  But of course he wasn't caught.

6   He stopped because that watch list was truly a wake-up call and

7   he woke up.  Devlin did not.  He continued to tip others for

8   the next three years on more than 12 deals.  Those tippees

9   truly only stopped when they were caught and they earned

10  literally millions of dollars.  Eric could have gotten back in

11  at any time, but he never asked.  As I said, he had woken up.

12         Judge, the probation office writes that Eric Holzer's

13  life outside of this case demonstrates, and I quote, "a good

14  person who made a terrible mistake."  Those words sum up this

15  sad case.  Wherever Eric has spent time he has been respected

16  and he has done good.  In high school he tutored others and

17  worked at the local youth court and the local social service

18  center.  In college he double majored and passed the CPA exam

19  in one sitting.  In law school he graduated in the top five

20  percent of his class and again tutored others.  As one friend

21  has written to the Court, he would help anyone who asked or

22  seemed lost.  He was a star soccer player and his guttiness

23  inspired his teammates.

24         He worked as a summer law clerk to a bankruptcy judge

25  here in the Southern District, and when the judge died he

stayed on to assist the court.  At his law firm he took on

numerous pro bono assignments despite stringent billing hours.

Outside work he helped friends and friends of friends who

needed tax preparation assistance.  You heard from one of them

today.  I thank you for doing so.  But she described Eric as

her guardian angel, her godsend.  Others would and have said

the same word.  Whatever Eric did for them he did for free.

Eric has also been on the board of his co-op.  I say

that because my own experience teaches that nowhere in life is

there a job more selfless nor thankless.

Before his arrest, well before his arrest, and while

working 60 hours a week at a law firm, he found time to

volunteer at the Upper Midtown Chabad, a Jewish center on

Manhattan's East Side, supervising children at the synagogue's

preschool and assisting in other community projects.  Rabbi

Shmuel Metzger is in court today to show his support for Eric.

By his presence he hopes to say to the Court, and show the

Court, his support for Eric.

Since his arrest, with more time on his hands, Eric

has worked for New York Cares.  He has spent time reading

stories to young children at homeless shelters, socializing

with senior citizens at a hospital for the aged, and working

with offenders at the midtown community court.  And always he

has cared for his family.  His grandmother is 89 years old and

cannot be here today, but Eric dotes on her.

1    Your Honor has rightly questioned those who steal and

2 victimize others and then give a fraction of their ill-gotten

3 gains to charity so as to burnish their image.  This is not

4 such a case.  Eric's good deeds involve his time, not his

5 money; his heart, not his wallet.  They have no ulterior

6 motive.  They reflect who he is.

7    In my sentencing letter, Judge, I wrote about the

8 collateral consequences of Eric's conviction.  As lawyers and

9 as a judge, we call them collateral, but of course they flow

10 inexorably from the conviction.  They are direct, and in this

11 case they are devastating.  Eric will lose his law license and

12 his CPA license.  He will lose them today when your Honor

13 pronounces sentence.  He will even lose a real estate license

14 that he obtained several years ago.

15    By my rough count, Eric Holzer spent more than 1,000

16 hours in law school classes and another 350 hours at NYU's

17 distinguished advanced tax program.  That does not count time

18 preparing for classes or studying for the bar.  All of that

19 likely more than 5,000 hours of preparation for a career in the

20 law is lost.  How serious a consequence is it?  My bet is that

21 most lawyers, if given a choice between a short prison sentence

22 and losing their law license, would opt for the former.

23    Eric has also forfeited his ill-gotten gains.  Today I

24 have given the government a check for $119,000.  Eric still

25 owns a heavily mortgaged apartment but has little else.  My

1  father used to employ the expression that some people have a

2  bright future behind them.  Eric once had a bright future ahead

3  of him.  A star tax lawyer who scoured the tax reports and

4  relished in advising clients on the intricacies of the law; the

5  person other associates went to on knotty issues; a sure thing

6  to make partner.  All of that is no more.

7          I know that your Honor is particularly concerned about

8  disparity amongst similarly situated defendants.  And here I

9  differ from the government.  I believe that the recent sentence

10  of Frederick Bowers deserves attention.  Bowers, like Eric, was

11  tipped by Matthew Devlin.  Bowers, like Eric, stopped taking

12  information from Devlin when others continued to do so.

13  Bowers, like Eric, had no criminal record and was facing a

14  guideline range of 12 to 18 months.  As you know, Judge Daniels

15  sentenced Bowers to probation and 2,000 hours' community

16  service.  To be sure, there are differences in the case.

17  Bowers' personal profit was only $12,000.  But he was a

18  securities professional.  He worked at Lehman Brothers and he

19  tipped the client who made $200,000 in illegal profits.  A

20  stockbroker gains good will when his client profits, and the

21  harm to the integrity of the marketplace is the same whether

22  the broker or client is trading.

23          Bowers' sentence has a lengthy dose of community

24  service.  If the Court were to impose a similar sentence here,

25  Eric could perform it with Rabbi Metzger, or anywhere that the

1  Court or probation thought was appropriate.  It would be a

2  stiff punishment but, unlike an incarcerative sentence, it

3  would be a productive use of those hours.

4       Judge, I have gotten to know Eric Holzer well.  We

5  have spent a great deal of time together, as happens between

6  lawyer and client.  He will rebuild his life.  He is already

7  trying to build a tax return preparation practice and has been

8  able to find a few paying clients.  He will continue to care

9  for his friends, for his family, and for his girlfriend Cindy

10 who has stood by him throughout this past year.  She, too, is

11 in court today.  He will continue to find time for good deeds.

12 Why?  Because that is who he is.

13      Judge, the guidelines call for 12 to 18 months.

14 Probation recommends a year and a day which would allow for

15 good time credit.  But as is so often the case, the guidelines

16 are harsh and mechanical and don't factor in the good that a

17 person has done, the substantial loss he has already suffered,

18 and the unique nature of this case.

19      In preparing for Eric's sentencing, I came across a

20 phrase from another judge in this courthouse, Judge Lynch, who

21 I believe sat for the first time as a member of the Second

22 Circuit today.  Judge Lynch wrote about a defendant who was

23 "old enough to have a meaningful record of good behavior, but

24 young enough to be given a second chance."  Those words fit

25 Eric Holzer.  He is old enough to have a meaningful record of

1    good behavior and young enough, I hope, to be given a second

2    chance.

3            The words of the probation department also fit:  "A

4    good person who made a terrible mistake."

5            I would ask that Eric Holzer be spared jail and given

6    a second chance.  He will not disappoint you or the people who

7    are here today to support him.  Of that, your Honor, I have

8    absolutely no doubt.

9            I thank the Court.

10           THE COURT:  Thank you.  Mr. Holzer, is there anything

11   you would like to say on your behalf before the Court sentences

12   you?

13           THE DEFENDANT:  Yes, your Honor.

14           Your Honor, today is the saddest and most difficult

15   day of my life.  I never imagined I would be standing here

16   awaiting sentence for a crime.  More than anyone, I know what I

17   did four years ago was wrong.  When Matthew Devlin approached

18   me twice in 2005, with information he overheard from his wife,

19   at the time I rationalized that to like somebody overhearing a

20   conversation at a party.  It was the worst judgment of my

21   entire life with the worst consequences.

22           For more than 20 years my goal has always been to be

23   an attorney to practice law, tax law.  Now I know that goal

24   will never be fulfilled because of my actions.

25           I have tried to live a good and honest life, one

1  filled with love, faith and strong moral values.  I have tried

2  to help people in the community to give back because of all I

3  was fortunate enough to receive.  As one of my friends wrote, I

4  am always the person who looks to raise people's spirits, to

5  always find the silver lining no matter how dark the cloud.

6  For me now there is no silver lining.  I have embarrassed

7  myself, my friends, my family, and my colleagues, which I

8  apologize sincerely.  I have destroyed everything I have worked

9  for throughout my life.  My law degree, I practiced law, my CPA

10  license, my reputation, my career, and my financial stability.

11  I know there is life ahead of me, but one which is very

12  different than the one I envisioned a while ago.

13         Your Honor, I take full responsibility for my actions.

14  I make no excuses.  I understand that you have to take all of

15  the circumstances into account for my sentencing, but I want

16  you to know, I need you to know, that the person standing in

17  front of you is ashamed and that you will never find Eric

18  Holzer in a situation like this again.  I pray for your

19  leniency.

20         Thank you.

21         THE COURT:  In accordance with the decision by the

22  United States Supreme Court in <u>United States v. Booker</u>, while

23  the United States sentencing guidelines are not mandatory, the

24  Court nonetheless must consult those guidelines and take them

25  into account when sentencing.  Therefore, the Court has

1    considered the findings of facts stated in the presentence

2    report, as well as the guidelines analysis and the

3    recommendations contained therein.  The Court has weighed this

4    information along with the factors listed in 18 U.S.C., Section

5    3553(a) in coming to its final sentencing decision in this

6    case.

7         The Court adopts the factual recitation in the

8    presentence investigation report.  Therefore, the Court finds

9    that under the guidelines, Mr. Holzer's offense level amounts

10   to 13 and his criminal history category falls into category I.

11   The recommended range of imprisonment for this offense level

12   and criminal history category is 12 to 18 months.

13        Mr. Holzer allocuted to one count of conspiracy to

14   commit securities fraud and to one count of securities fraud.

15   He used information that he knew was material and nonpublic in

16   connection with the purchase of shares of at least two stocks,

17   Eon Labs and Abgenix, and on at least one occasion he

18   compensated the provider of this inside information with cash.

19   The government and the defendant agree that the loss amount

20   attributable to the information he obtained by illegal means is

21   $119,351.

22        Subsection (a)(1) of 18 U.S.C., Section 3553(a)

23   requires that courts take into consideration the nature and

24   circumstances of the offense and the history and

25   characteristics of the defendant.  The Court is aware of Mr.

1  Holzer's commendable community service and his pro bono work

2  with various not-for-profit organizations.  The Court is also

3  aware that Mr. Holzer has no criminal history, and that the

4  probation office's characterization of Mr. Holzer is that "his

5  life outside of this case demonstrates that he is a good person

6  who made a terrible mistake."  However, despite Mr. Holzer's

7  assessment by the probation office, he knowingly traded on

8  material, nonpublic information for his own personal gain, and

9  according to the PSR, he agreed to stop receiving those tips

10  only after he became aware that his name appeared on a watch

11  list.  In addition, Mr. Holzer committed these acts while a

12  member of the state bar and working as a tax attorney.

13       Subsection (a)(2) of 18 U.S.C., Section 3553 requires

14  that the Court consider the need for the sentence to promote

15  certain objectives of the criminal justice system, namely,

16  punishment, specific and general deterrence, and

17  rehabilitation.

18       Pursuant to Section 3553(a)(6), the Court is also

19  directed to consider the need to avoid sentencing disparities

20  among defendants with similar records and similar offenses in

21  other cases, as well as in connection with the case at hand.

22       On September 16, 2009, in a case related to this one,

23  Judge Daniels sentenced Frederick Bowers to a term of three

24  years of probation, a $15,000 fine, and 2,000 hours of

25  community service.  There are some similarities between the

1   circumstances of Mr. Bowers and Mr. Holzer.  Most notably, the

2   total offense level for both is 13, resulting in the same

3   sentencing guidelines range of 12 to 18 months.  In addition,

4   both are considered by the probation office to be good people

5   who made terrible mistakes.

6           However, there are also important differences between

7   the two cases.  Mr. Bowers did not trade on the insider

8   information that he received.  Rather, he assisted in providing

9   the information to others, for which he was compensated a total

10  of approximately $12,000.  Mr. Holzer, however, did trade on

11  the insider information on multiple occasions, in accounts

12  under both his name and his relatives' names, and he received

13  in excess of $119,000 in profits from those acts --

14  significantly more than Mr. Bowers received.  In addition, the

15  probation office recommended a term of probation for

16  Mr. Bowers.  In this case, however, the probation office

17  recommends a sentence of 12 months and one day for Mr. Holzer.

18          Mr. Holzer, please rise.

19          Taking into account the nature and circumstances of

20  the offense and the history and characteristics of the

21  defendant, and considering all of the factors listed in 18

22  U.S.C., Section 3553(a), the Court finds that a sentence of

23  five years of probation is appropriate and that it is

24  reasonable in these circumstances.

25          The term of probation shall be conditioned upon your

1    service of nine months in a residential reentry center, to be

2    served on consecutive weekends, to begin on a date designated

3    by the probation office.  You shall report to the residential

4    reentry center designated by the probation office and you shall

5    remain on weekends from Friday through the following Monday

6    morning.  In addition, you may, but are not required, to

7    satisfy the nine month requirement by serving in the

8    residential reentry center on a schedule of consecutive days or

9    weekends and/or weekdays, subject to the center's availability,

10   on a program approved by the probation office.

11            In addition, you are ordered to pay a fine of $15,000.

12            The Court finds that the sentence imposed upon Mr.

13   Holzer is reasonable in consideration of the factors stated in

14   18 U.S.C., Section 3553(a), in that it is sufficient but not

15   greater than necessary to comply with the purposes of

16   sentencing.

17            I have also approved the forfeiture as applicable in

18   this case.  The government has submitted an order of forfeiture

19   of a sum of $119,351, which I will endorse.  This money shall

20   be forfeited to the United States.

21            You are also in addition ordered to pay to the United

22   States a special assessment of $200, which shall be due

23   immediately.

24            You must comply with the standard conditions of

25   probation and the following mandatory conditions:

1    You shall not commit another federal, state or local

2    crime.

3    You shall not illegally possess a controlled

4    substance.

5    You shall not possess a firearm or destructive device.

6    You shall refrain from any unlawful use of a

7    controlled substance.  You shall submit to one drug testing

8    within 15 days of placement on probation and at least two

9    unscheduled drug tests thereafter, as directed by the probation

10    officer.

11    You shall cooperate in the collection of DNA as

12    directed by the probation officer.

13    In addition, you shall obey the following special

14    conditions:

15    You shall provide the probation officer with access to

16    any requested financial information.

17    You shall not incur any new credit card charges or

18    open additional lines of credit without the approval of the

19    probation officer unless you are in compliance with the

20    installment payment schedule.  The installment payment schedule

21    relates specifically, in addition to the restitution and

22    forfeiture, to the fine.  That fine must be paid in equal

23    monthly installments during the course of the five years of

24    probation.

25    You shall report to the nearest probation office

1    within 72 hours.

2            The Court recommends that you be supervised by the

3    district of residence.

4            The sentence as stated is imposed.

5            Mr. Holzer, to the extent that you have the right to

6    appeal your sentence, and you are unable to pay the cost of an

7    appeal, you have the right to apply for leave to appeal in

8    forma pauperis, meaning as a poor person.  If you make such a

9    request, the clerk of court must immediately prepare and file a

10   notice of appeal on your behalf.

11           Do you understand your right to appeal to the extent

12   that it exists?

13           THE DEFENDANT:  I do, your Honor.

14           THE COURT:  Ms. Loughnane, are there any remaining

15   counts or underlying indictments that need to be dismissed at

16   this time?

17           MS. LOUGHNANE:  There are none.

18           THE COURT:  Is there anything else from the

19   government?

20           MS. LOUGHNANE:  No, your Honor.

21           THE COURT:  Mr. Shechtman, is there anything else from

22   the defendant?

23           MR. SHECHTMAN:  There is, Judge.  Two things.  One,

24   and I apologize, your Honor mentioned restitution in passing.

25   Is there a restitution order in the case?  I wouldn't think so

1  given the nature of the crime; that is, it is just a

2  forfeiture.

3  　　　　THE COURT:  The restitution I referred to was the

4  forfeiture.

5  　　　　MR. SHECHTMAN:  Second, and I apologize to the Court,

6  could you explain for my benefit, but more importantly for Mr.

7  Holzer, how that sentence works?  It is nine months of

8  weekends?

9  　　　　THE COURT:  Nine months, which could be served on

10  consecutive weekends, or, in addition, it could also be served

11  on any consecutive period of days, weekends or nights, in a

12  program as approved by the probation office.  In other words,

13  it could be all weekends, or it could be weekends plus a

14  consecutive number of days, or it could be weekends,

15  consecutive days and/or evenings.

16  　　　　MR. SHECHTMAN:  By nine months, one isn't counting up

17  the days to get nine months, it's nine months of weekends?

18  Again, I apologize.

19  　　　　THE COURT:  It is nine months of either weekends or

20  those consecutive days or evenings.

21  　　　　MS. LOUGHNANE:  I take it, if I am understanding the

22  Court correctly, the total sentence --

23  　　　　THE COURT:  The total has to be nine months.

24  　　　　MS. LOUGHNANE:  Nine months of days.  The number of

25  days equivalent to nine months of time in the program.

1      THE COURT:  Yes.  It is an accumulation of days that

2  would total nine months.  And that has to be over the course of

3  the five years of probation.

4      MR. SHECHTMAN:  I think your Honor referred to it as a

5  residential reentry center, which is, I am old-fashioned --

6      THE COURT:  That is the Bureau of Prisons' designation

7  for what is ordinarily known as a halfway house or a community

8  facility.  It is not a prison.

9      MR. SHECHTMAN:  Typically, those halfway houses allow

10  someone out to work.  Does your Honor's sentence contemplate

11  that?

12      THE COURT:  Whatever regulations apply would apply.

13  Since he has the option of scheduling on weekends, then

14  obviously during the week he could work.

15      MR. SHECHTMAN:  I apologize to the Court.  I am going

16  to wind up on the phone with the Bureau of Prisons, and I just

17  want to make sure they and I understand the sentence.  If he

18  were to decide to do the nine months straight, so to speak?

19      THE COURT:  He has the option of doing that.

20      MR. SHECHTMAN:  If their regulations permit him out to

21  work during the day, would that be acceptable to the Court?

22      THE COURT:  As long as the total amount that he

23  ultimately serves is nine months, yes.

24      MS. LOUGHNANE:  This spins out of Mr. Shechtman's

25  question.  So there is no restitution in your order, it is

1 | solely a forfeiture?

2 |           THE COURT:  That's correct.

3 |           MR. SHECHTMAN:  Finally, your Honor wouldn't consider

4 | substituting home confinement for any portion of it?

5 |           THE COURT:  The sentence as stated is imposed.

6 |           MR. SHECHTMAN:  I thank the Court.

7 |                              oOo

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |



# EXHIBIT 19

1 | UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
2 | -----------------------------x

3 | UNITED STATES OF AMERICA,                 New York, N.Y.

4 |              v.                           11 CR 665 (RPP)

5 | H. CLAYTON PETERSON,

6 |                    Defendant.

7 | -----------------------------x

8 |

9 |                                          October 11, 2011
                                          4:15 p.m.

10 |

11 | Before:

12 |                    HON. ROBERT P. PATTERSON, JR.,

                                          District Judge

13 |

14 |                         APPEARANCES

15 | PREET BHARARA
          United States Attorney for the
16 |      Southern District of New York
     BY:  MICHAEL LEVY
17 |      ANTONIA APPS
          Assistant United States Attorneys

18 |

19 | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLC
          Attorneys for Defendant
     BY:  STEVEN R. GLASER
20 |      GARY PHILLIPS

21 |

22 |

23 |

24 |

25 |

1              THE DEPUTY CLERK:  All rise.

2              THE COURT:  Please be seated.

3              (Case called)

4              MR. LEVY:  Good afternoon, your Honor, Michael Levy

5    and Antonia Apps for the government.

6              THE COURT:  Good afternoon.

7              MR. GLASER:  Good afternoon, your Honor.  Steven

8    Glaser and Gary Phillips on behalf of Mr. Peterson.

9              THE COURT:  Good afternoon.  Good afternoon,

10   Mr. Peterson.

11             I have a presentence report from the Probation

12   Department dated September 27th, but I believe I received it

13   earlier, but maybe not.  Maybe I -- so the necessary 35 days

14   haven't passed, if the September date is correct, unless the

15   defendant wants to waive that period of time.

16             MR. GLASER:  We did request an expedited sentencing,

17   your Honor, and we will waive.  Thank you.

18             THE COURT:  All right, Mr. Peterson, you want to waive

19   the time also?

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  All right, sir.

22             And then I have a submission by the defense, from

23   Mr. Glaser which indicates that -- I'm sorry, that doesn't

24   indicate it -- from Mr. Glaser dated October 3rd, and together

25   with the submission and letters from Carrie I Hofmann,

1   Mr. Peterson's daughter; Drew Peterson, his son; John C. Amman,

2   long time friend and business associate; Brian Jackson, same;

3   Jack A. Henry, also the same; Michael Huseby, the same; and

4   David Liniger, the same.  Most of those people, as I recollect

5   it, worked for Arthur Andersen with Mr. Peterson.  I've read

6   those letters.  And also a letter from Paul Miller, who is a

7   member of the Delta Upsilon Fraternity, and Neil Mulholland,

8   president and CEO of The National Park Foundation; Daniel

9   Predovich, a friend and business associate; Timothy Schmidt, a

10  long time friend; Theresa D. Shelton, friend of Mr. Peterson

11  for the last 26 years, and Frank York, President of Board of

12  Kansas State Chapter of Delta Epsilon.

13          And I've also received -- I don't believe I've

14  received anything from the government.

15          MR. LEVY:  That's right, your Honor.

16          THE COURT:  I do have the plea agreement here.  Have

17  you reviewed the presentence report, Mr. Glaser, and has Mr.

18  Peterson reviewed it?

19          MR. GLASER:  I have, your Honor, and I've reviewed it

20  with Mr. Peterson.

21          THE COURT:  Are there any changes to be made in the

22  presentence report?

23          MR. GLASER:  Your Honor, in our submission we pointed

24  out a very few material inaccuracies, but other than that, we

25  have no --

1          THE COURT:  Which inaccuracies?  I should correct any

2    inaccuracies that are currently there.  I don't make them until

3    I hear them both parties agree they should be made.

4          MR. GLASER:  There's, honestly, nothing material.

5    There's a reference to, for example, Mr. Peterson moving to

6    Washington, D.C., in the 4th grade, whereas he moved when he

7    was three months old.  Nothing of any substance.  We've noted

8    those in our submission, and we believe that the PSR is

9    materially accurate as a whole.

10         THE COURT:  There's nothing that you think would

11   affect any sentence that I, or the carrying out of any sentence

12   that I might impose?

13         MR. GLASER:  That is correct, your Honor.

14         THE COURT:  All right.  And the government has no

15   changes either?

16         MR. LEVY:  That's right, your Honor.

17         THE COURT:  All right, then I'll hear from you on

18   sentence, Mr. Glaser.

19         MR. GLASER:  Thank you, your Honor.  I'm going to be

20   brief, because I think we made most of the salient points we

21   needed to in our submission.

22         We are requesting in this case, consistent with our

23   ability to under the plea agreement, a non-guideline sentence,

24   generally in accord with what's recommended by the Probation

25   Office.  I would note, your Honor, that --

1       THE COURT:  The Probation Office does not recommend

2    incarceration.

3       MR. GLASER:  Correct, your Honor, and we would

4    request -- and we would recommend a sentence consistent with

5    what the probation office recommends, which would be a non-

6    jail sentence.  In my experience, your Honor, obviously you

7    have far more experience than me, I have not seen a probation

8    report that has recommended a non-guideline sentence.  And I

9    believe that that reflects the extraordinary nature of Mr.

10   Peterson and how aberrant his conduct was in this case.

11      And what we would request, your Honor, is in

12   fashioning a sentence, to look at the totality of Mr.

13   Peterson's life, rather than just through the prism of

14   approximately a single week in his life, where he made a very

15   serious lapse in judgment for which he accepts full

16   responsibility, and appreciates the wrongful nature.  As a

17   result of that, he has pled guilty.  He is a convicted felon,

18   and all of the consequences that flow from that inure to his

19   detriment; the loss of a reputation built over a lifetime.  He

20   will not work in his profession any more; potential for

21   straining an important relationship with his son.  The

22   fundamental question to us, your Honor, is whether there is any

23   incremental need under these circumstances for a period of

24   incarceration.  And we would submit, your Honor, that that is

25   simply not necessary in this case; that given the totality and

1  the consolation of factors here, that the recommended sentence

2  by the Probation Department, probation plus three months of

3  home confinement, will serve the factors set forth in 18 U.S.C.

4  3553(a).

5       The only minor point I would make, your Honor, is that

6  I understand that the Probation Office has recommended a

7  penalty of $60,000.  Now, it's my understanding, and Mr. Levy

8  will correct me if I'm wrong, is that the government is going

9  to be asking for forfeiture.  We don't care whether it's

10  characterized as forfeiture or penalty.  We're certainly

11  prepared to pay that, that to which was accrued by the conduct

12  at issue.  We would just request that Mr. Peterson not be

13  required, in effect, to double pay for that.  So certainly

14  willing to pay the $60,000 or whatever your Honor imposes, but

15  we would request that if your Honor imposes it as forfeiture,

16  then we simply pay it as forfeiture, or if it's just a penalty,

17  then we pay it as penalty, but not both.

18       THE COURT:  Well, I read the presentence report too.

19  And, by the way, we do get recommendations since Booker, United

20  States versus Booker, of this sort.  We didn't get them when

21  you were an Assistant.  I'm sure it wasn't due to any fault of

22  yours.  But, in any event, we do get some now.  And I'm not --

23  but that's just a minor correction.

24       But when I read the presentence report, it seemed to

25  me that this defendant has substantial assets and that the fine

1  was too low, and that I should increase the fine.  So I'd like

2  to not -- for the fact of the violation, as punishment for the

3  violation, not as reimbursement for the loss sustained.  So I

4  want to give you notice that that's what I was thinking and

5  still am thinking, and would want to hear from you on that

6  subject.  Because it's a -- that what I was contemplating.

7  Because otherwise it seemed to me with the real estate assets

8  that are here, that the money could be raised for more

9  substantial penalties.

10         And the other thing that I've noted is that

11  particularly in these cases, and this -- and there are a lot of

12  them in the Court that -- let me put it this way -- that I

13  think there's some fault that judges are too lenient on these

14  cases.  And I see articles about that.  Because I think most of

15  the defendants come from similar educational background and

16  similar success in life background that the judges come from.

17  And whereas if we get someone who is from a less fortunate

18  background in nonviolent crimes, pretty heavy sentences are

19  handed out comparatively.  So it always represents a problem

20  for the judge to be sure that there's a reason for fairness.

21         Now, in this case, you haven't touched on the reasons

22  for the non-incarceration recommendation of the presentence

23  report.  And maybe they do point to a lot of grounds why Mr.

24  Peterson should not be sentenced to jail, and I think they're

25  valid reasons.  But I think -- I mean, it's to me quite a

1   different story from the story of the background of some of the

2   defendants who have been recently sentenced by my fellow judges

3   and by myself in these cases.  So I'm always concerned that the

4   notoriety that these cases give or are given by the press, is

5   going to lead to a misunderstanding on the part of the public

6   as to why a sentence such as a non-incarcerating sentence here

7   is done.  It's true that most of the -- it's true that most of

8   the articles that you read just don't get into that.  They just

9   give you the number, say --

10          MR. GLASER:  Your Honor --

11          THE COURT:  -- judges --

12          MR. GLASER:  I apologize.

13          THE COURT:  You don't have to apologize.  Sentence is

14   whatever it is and that's it.  They don't quote any reasons

15   beyond it.

16          Now, you've shown in the papers a great sense of

17   humanity in terms of -- and Christian attitude Judeo-Christian

18   attitude or Muslim-Christian attitude, whichever, in terms of

19   concern for his fellow man and doing something about it, not

20   just writing a check or -- but doing something about it

21   himself, and sacrificing his own opportunities in doing it.  So

22   that that's one of the things.

23          But I think those things should be spelled out.

24   Because I don't know whether there's any member of the press

25   here, but I think that if there is someone from the press or if

1  they pick up the transcript and read it, they ought to

2  understand the grounds for a non-incarceration sentence.

3           But I want to hear from you on the fine part.  Because

4  in order to make up for the non-incarceration sentence, it

5  seems to me there should be a penalty because of the nature of

6  the crime and to -- otherwise, it's just leaving things sort of

7  on a par with what they were before the crime was committed.

8           MR. GLASER:  Your Honor, your points are very well

9  taken.  And the beauty of our system now is that we do have an

10 individualized sentencing regime where you can truly look at an

11 individual and their life, and the context, and make an

12 individualized determination without necessarily -- with regard

13 to what is going on in the press which, unfortunately, we have

14 very limited control over.

15          I would say the following things with regard to this

16 particular case.  It's unlike many of the other cases that we

17 have seen where there was systematic sharing of information in

18 order for there to be gain.  We have, as I said, an isolated

19 incident, wrongful as it was, but it was an isolated incident.

20          And in terms of Mr. Peterson himself, we have a, as

21 attested to in the letters in support, an absolutely sterling

22 career and reputation for honesty and integrity over a 30 plus

23 year career that was attested to by people who worked with him

24 during that time, and who would say -- who said things like

25 would never cut corners, always led by example in terms of his

integrity.

First of all, in terms of his -- and also in terms of
his willingness to give back to the community, your Honor's
exactly right.  It wasn't just that he opened up his checkbook,
although he did that too.  But it was mentoring those around
him and infusing them with a sense that it was critical for
them as good members of the community to give back to the
community.  And there's one very telling example that we
referred to in our papers, that he was such an inspiration to
one of his friends and co-workers, that he engaged in civic and
charitable endeavors to a degree that he never would have, but
for Mr. Peterson.

Also, in terms of his selflessness doing things.
Again, on a small or large scale, with nothing in return.  Upon
the demise of Arthur Andersen in 2002, which Mr. Peterson of
course had nothing to do with.  He was very senior there.  He
had approximately 600 people who reported to him.  He had
terrific client contacts.  And he could have written his own
ticket, for lack of a better word, brought his clients with
him, and commanded a very hefty salary, but he forewent that
opportunity.  And it was more important to him that the people
who worked for him, whether they were the senior audit partners
or it was the secretarial staff, that they obtain employment
instead.  And he negotiated a resolution in which all of those
people could find employment with the Denver based accounting

1    firm.  And to make the deal work it meant that Mr. Peterson

2    could not join.  So he permitted all these people to gain

3    employment at his own expense.  And as his son Drew writes in

4    his letter, people randomly come up to Drew and talk about what

5    a selfless and wonderful thing that Mr. Peterson did on their

6    behalf and how grateful they are.  So he touched many many

7    lives, again asking nothing in return and getting nothing in

8    return.

9           And on top of that, to further show and demonstrate

10    that what his character is and why this incident is so

11    aberrational and out of context, is his honorable service to

12    our country during the Vietnam war, in which he served in the

13    First Air Calvary Division, which was among the most decorated

14    units in Vietnam, and at great personal risk to himself flying

15    in helicopters at the time, and was a recipient of the Bronze

16    Star.

17           Your Honor, I would submit that when you put all of

18    that together, and look at the full measure of the man, rather

19    than that isolated one week where he had a very very serious

20    lapse in judgment, there is no incremental value to a period of

21    incarceration for Mr. Peterson.

22           And with respect to a fine or penalty, your Honor, we

23    defer to the Court to fashion an appropriate remedy in that

24    respect, and we would defer to your Honor to come up with

25    whatever fine or penalty that you believe would be appropriate

1    for the conduct in this case.

2              THE COURT:  All right.  Are you done?

3              MR. GLASER:  I believe so, your Honor, although if

4    there is anything else you would like me to add, I'm -- or to

5    address, I'm happy to do so.

6              THE COURT:  I just, I'm glad you addressed what you

7    did.

8              There are other acts that are mentioned in the letters

9    that you sent me, and I read the letters carefully.

10             MR. GLASER:  Thank you.  Some of the -- as you can

11   tell, some of the letter writers wanted to maintain their

12   anonymity, and, hence, they were submitted simply to the Court

13   and provided also to the government for their review as well.

14   But as you read through the letters, some of the themes you get

15   are, additionally, that Mr. Peterson is there as a good friend

16   to people, that he takes interest in their children.  There's

17   an incident in which Mr. Peterson's very close to a friend with

18   adopted children, and he wasn't asked to do so, but he donated

19   quite a lot of money to their adoption agency.  He's there to

20   take care of his granddaughter whenever his daughter needs him

21   to do that, and --

22             THE COURT:  On a regular day basis, as I recollect it.

23             MR. GLASER:  Yes.

24             THE COURT:  So he took over Tuesdays or some one day a

25   week.

1              MR. GLASER:  Exactly.  And it was Mr. Peterson's

2    pleasure to do that, of course.

3              THE COURT:  Not just show up for --

4              MR. GLASER:  Yeah, on birthdays or the holidays, but

5    to be an active presence in her life.  And despite, you know,

6    working very hard to achieve, always being there.  And despite

7    the difficult situation of a divorce, being there for his

8    children and helping them develop and maintaining a close

9    relationship with them both.  It's really an exemplary life,

10   your Honor, but for this very very serious lapse in judgment

11   for which Mr. Peterson accepts, you know, full responsibility.

12             The letters touch on just that he's a good natured

13   person, and is always there willing to drop things on a

14   minute's notice to help out a friend and to be there for his

15   friends.

16             I would submit, you know, as I said, an exemplary

17   life, different than what I have been seeing in the papers of

18   the many defendants who have been sentenced in insider trading

19   cases.

20             THE COURT:  And with respect to Arthur Andersen, he

21   was not in the management part of Arthur Andersen that was all

22   involved.

23             MR. GLASER:  That is correct.  My understanding is

24   that occurred in Texas in an industry that Mr. Peterson had

25   absolutely nothing to do with whatsoever.

1           THE COURT:  He was in charge of the Denver office, and

2    the Denver office is what had the 600 employees.

3           MR. GLASER:  That's correct, your Honor.

4           THE COURT:  Swept along with the entire disruption

5    of -- the end of Arthur Andersen.

6           MR. GLASER:  Exactly.  But, nevertheless, were there

7    to help the other people there pick up the pieces of their

8    lives and move on; people who needed a salary in order to put

9    food on the table for their families.

10          THE COURT:  All right.

11          MR. GLASER:  Thank you, your Honor.

12          THE COURT:  All right.  Thank you.

13          Mr. Levy, are you going to say anything in connection

14   with the sentence?

15          MR. LEVY:  No, your Honor, I don't have anything to

16   say, other than on the issue of the financial penalty, we will

17   be seeking forfeiture.  We're going to ask your Honor to --

18          THE COURT:  That forfeiture would be somewhere in the

19   nature of the 60 to $70,000?

20          MR. LEVY:  Exactly, your Honor.  We'll submit the

21   exact amount, but it is the profits from the trading and should

22   be --

23          THE COURT:  Within the normal period of 30 days.

24          MR. LEVY:  That's right, your Honor.  Probably much

25   sooner than that, we'll get you a final number, but I just

1  wanted your Honor to have that in mind when calculating what

2  other financial penalties.

3          THE COURT:  But you don't take any position on the

4  fine at all?

5          MR. LEVY:  No, your Honor.  Your Honor has the full

6  record in front of you, and the government leaves it to your

7  Honor to craft an appropriate sentence.

8          THE COURT:  Before I hear from Mr. Peterson, I just

9  want to look over the material one second more.

10          Mr. Henry mentioned community activities for the

11  Greater Denver Corporation, in Colorado Women's College and AMC

12  Cancer Research and the Volunteers of America, and that he's

13  testified at the Legislature regarding Civic and Community

14  Development Activities.  I gather that may have been in

15  Seattle, but I may be wrong.

16          All right.  Mr. Peterson, would you like to say

17  something on your own behalf before I impose sentence?

18          THE DEFENDANT:  Yes, your Honor.

19          I come here today as a person who broke the law and

20  violated the trust of people who relied upon me.  I do come

21  from a humble background.  I come from a little town in Kansas

22  of 1,000 people.  Only 20 of my class throughout the year, and

23  I was the first person in the college.  I put myself through

24  college, and I graduated and got drafted by the U.S. Army,

25  thanks to Lyndon B. Johnson.  That's how I ended up in Vietnam

1    as a private, and did my time and came back, and was 33 years

2    with Arthur Andersen, starting at the bottom, and going to the

3    top, managing partner for my last 13 years, and bringing people

4    in and developing them, mentoring them and making them

5    successful.

6            I apologize for the hurt that I caused my family, my

7    friends, and my business associates.  I had no intention of

8    doing that.  My life and reputation will never be the same as a

9    result.  At 66 years old I will live with this stigma for the

10   rest of my life.  And that's all I can say.  I will accept

11   whatever penalties you put upon me, and I thank you for your

12   time and consideration.

13           THE COURT:  Thank you, Mr. Peterson.

14           Let me make the necessary findings under the

15   guidelines.

16           THE COURT:  This is a charge of conspiracy to commit

17   securities fraud under 18 United States Code Section 371 and 15

18   United States Code Section 78(j)(b) and 78(f)(f), and then a

19   second count of the security fraud under 15 United States Code,

20   Section 78(j)(b) and 78(f)(f).

21           The events in question took place between April 8th

22   and April 15th, in which Mr. Peterson, having inside knowledge

23   as a director of a company about to be acquired, advised his

24   son to purchase stock in the company for his daughter.

25           The base offense level -- I should say the guideline,

1    proper guideline is found under 2B1.4(a) of the guidelines

2    applicable to a violation of 15 United States Code, Section 78

3    (j)(b), and that base offense level under that guideline is

4    eight.

5            Because the amount in question was more than 30,000,

6    but less than 70,000, six levels are added pursuant to

7    guideline 2B1.4(b), and 2B1.1(b)(1)(D).  That makes a total of

8    14 levels.  And because the defendant abused a position of

9    trust in a manner that facilitated the commission of the

10   offense, two levels are added under guideline two -- excuse me

11   3B1.3, making a total adjusted offense level of 16, from which

12   three points are deducted under guideline 3E1.1(a) and (b)

13   because he has admitted his be responsibility for the crime in

14   a timely manner.  That leaves an adjusted offense level of 13.

15           Defendant has no prior juvenile adjudications or adult

16   criminal convictions, other than a number of convictions for

17   driving under the influence, which do not result in any

18   criminal history category points, and were committed sometime

19   ago.

20           Accordingly, the criminal history category, number of

21   points is zero and the criminal history category is one, for a

22   total offense level of 13 and a criminal history category of I,

23   the guidelines call for a sentence of 12 to 18 months, and

24   supervised release for two to three years, a fine of 3,000 to

25   $5 million, and forfeiture, which the government is seeking as

1    I understand it in this case, and special assessment of $100 on

2    each count, for a total of $200, which is mandatory.

3            The presentence report recommends no imprisonment and

4    a term of two years of probation, with three months served in

5    home confinement.

6            There are no suggested departures under the

7    guidelines, but the Court, although it must consider the

8    guidelines, also has to consider Title 18 and Section 3553(a)

9    in order to fashion a sentence which is sufficient, but not

10   greater than necessary to achieve the purposes set forth in

11   paragraph two of Section 3553(a).

12           Paragraph two requires that the court, in addition to

13   considering the nature and circumstances of the offense, and

14   the history and characteristics of the defendant, to also

15   consider the need for the sentence imposed to reflect the

16   seriousness of the offense, to promote respect for the law, and

17   to provide just punishment for the offense; second, to afford

18   adequate deterrence to criminal conduct.  That's under the law,

19   it is to deter other people from committing the same crime and,

20   C, to protect the public from further crimes of the defendant.

21   That provision deals with the deterring of this defendant from

22   similar conduct in the future; and, D, to provide the defendant

23   with needed educational and vocational training, medical care

24   or other correctional treatment in the most effective manner.

25           Well, I think that the presentence report -- I agree

1   with the presentence report with respect to this defendant.

2   The penalty they suggest is sufficient but not greater than

3   necessary to protect the public from further crimes of the

4   defendant.  And then I'm making that determination based on the

5   content of the presentence report, which shows that he engaged

6   in a number of civic activities not as a figurehead, but as a

7   participant, a person who gave of himself, not just of his

8   wallet, and engaged in community activities to help his

9   community.  And that's significant.  The record is -- and he's

10  done that throughout his life from what I gather.

11          The difficulty is that this is a serious crime.  And

12  the reason it is serious is because the greed in this society

13  has become something that is really obscene.  And,

14  unfortunately, as we've seen in the numerous prosecutions in

15  this Court the last few years, that inside trading has been

16  rife.  Now, you can't punish people for other people's crimes,

17  but you are supposed to take into account some deterrence.

18  And, as I said earlier, one of the difficulties is that these

19  people come from well educated background.  They've got college

20  degrees in business administration, and business school

21  degrees, lawyers, and it's very troubling what's going on in

22  our society.  Recently, you may have heard a former lawyer -- I

23  guess he is still a lawyer -- but he also appears on television

24  and other programs, is saying that he thinks that lying has

25  become something that is not considered particularly wrong any

1  more.  And I think he uses as the example the case involving

2  Edward Washington case, in which the members in government were

3  involved.  But that's just as an example.

4         But these crimes show that -- that are being

5  prosecuted, that it is a serious problem about people having a

6  sense of honesty and integrity.  And I don't know whether, and

7  I think in the normal insider trading case, this Judge I think

8  considers deterrence the main, main thing that the courts have

9  got to keep in mind, and particularly since they come from --

10  they're people who have had advantages in life, and so that's

11  difficult.

12         So I'm going to follow the presentence report, but I'm

13  going to impose a fine that is greater than they recommend,

14  because I think that, one, I think there should be a penalty

15  that -- greater than three months home confinement and

16  probation for two years.  I think the -- well, that this man

17  will have to forfeit somewhere between 60 and $70,000, the gain

18  that was ultimately obtained on behalf of the people who

19  traded.

20         But now the difficult thing is, well, what is a fair

21  fine and not retribution, which I don't believe is a proper

22  sentencing concept.

23         See, the difficulty is that these people, maybe

24  deterrence doesn't, isn't -- shouldn't be paramount.  That's

25  how I was thinking of this.  I'm not sure it should be.

1    Because this case is different than the other cases or the

2    other cases being currently prosecuted, because it doesn't

3    involve scheming with other people to, in the trade to benefit

4    by inside information, but rather is a one time event,

5    otherwise exemplary life except for the driving under the

6    influence.

7            So I'm going to sentence the defendant to probation

8    with two years, with three months to be served in home

9    confinement.  And there will be special assessment of $200, and

10   the defendant forfeit to the United States, pursuant to 18

11   United States Code, Section 981(a)(1)(C), and 28 United States

12   Code 2461, all property, real and personal, that constitutes --

13   is derived from proceeds traceable to the commission of either

14   of the offenses.  And I'm not -- and I'm concerned, however,

15   Mr. Levy, that this the forfeiture won't be something that is

16   derived from the proceeds traceable to the commission of any of

17   the offenses.  If he will have -- that he has any property that

18   constitutes or is derived from the proceeds traceable to the

19   commission of the offenses, isn't there another section that

20   you're relying on that the presentence report doesn't reflect?

21           MR. LEVY:  I think it may be the substitute assets

22   provision, your Honor.

23           THE COURT:  I'm sorry?

24           MR. LEVY:  I think it's the substitute assets

25   provision.  I'm certainly no forfeiture expert, but my

1  understanding is that if there -- if the defendant himself does

2  not have those proceeds, there is a substitute.

3          THE COURT:  But that involves his receiving those

4  proceeds at sometime, and I don't think you've got evidence

5  that he received these proceeds at any time.

6          MR. LEVY:  I don't think that he personally needs to

7  have.  And there's a conspiracy count in this case.

8          THE COURT:  Well, the substitute is if they've been --

9  as I recollect the provision, Mr. Levy, the substitute

10  provision applies when he has received them, but has deposed of

11  them in some way, or something.  That's my recollection.  But

12  I'd have to get out the forfeiture section, so I'm putting you

13  to the test here.

14          MR. LEVY:  I'm merely just trying to give your Honor

15  any sort of an educated analysis on my part.

16          THE COURT:  You're going to show me that in your

17  forfeiture order, because this doesn't seem -- what I've just

18  stated here doesn't seem to me necessarily applying to the

19  defendant.

20          MR. LEVY:  I do believe, and it's possible we could

21  pull out the statute itself.  The way we worded it in the

22  information, at least, is all property, real and personal, that

23  constitutes or is derived from proceeds traceable to the

24  commission of the offenses.  I don't know that there's any

25  requirement that that have ever been in the hands of this

1    defendant.  I think the proceeds of that trading are derived

2    from his offense, whether he in fact ever held that money.

3              THE COURT:  All right.  It doesn't have to be received

4    by which him.

5              MR. LEVY:  I think that's right.

6              THE COURT:  Then I won't change my oral statement,

7    which binds the situation.

8              MR. LEVY:  Yes, your Honor, I think forfeiture is

9    appropriate for the reasons we've discussed.

10             THE COURT:  All right.

11             And the mandatory conditions of supervised release

12   will be that the defendant shall not commit another federal,

13   state or local crime; defendant shall not illegally possess a

14   controlled substance; defendant shall not possess a firearm or

15   destructive device.  Mandatory drug testing is suspended based

16   on the Court's determination that the defendant poses a low

17   risk of future substance abuse.  Standard conditions of

18   supervision one through 13 will also apply, with the following

19   special conditions:  And that is that the defendant shall

20   provide the probation officer with access to any requested

21   financial information, and if deemed necessary by the Probation

22   Officer, the defendant shall participate in alcohol after care

23   treatment program under a co-payment plan, which may include

24   testing via breathalyzer at the direction and discretion of the

25   Probation Officer.  And the defendant shall comply with the

1    conditions of home confinement for a period of three months.

2    During this time you will remain at your place of residence,

3    except for employment and religious observations and medical

4    attendance to medical problems of yourself and your immediate

5    family, and other activities approved by your Probation

6    Officer.  And you will maintain a telephone at your place of

7    residence without call forwarding, modem, caller ID, call

8    waiting or portable cordless telephones for the above period,

9    at the direction of your Probation Officer.

10           I'm not going to order electronic monitoring.  Home

11   confinement shall commence on a date to be determined by the

12   probation officer.  And should home confinement be imposed, the

13   defendant shall pay the costs of home confinement on a self

14   payment, co-payment basis as directed by the Probation Officer.

15   Upon a showing of good cause, the Court will authorize

16   electronic monitoring at the request of the Probation Officer.

17           Defendant is to report to the nearest probation office

18   within 72 hours of release from custody.  And if the defendant

19   is sentenced to any period of supervision, he will be

20   supervised in the district of his residence.  So he is

21   sentenced to a period of supervision and he'll be supervised in

22   the district of his residence.

23           Now, I have to determine the amount of the fine, and I

24   want to just look over the presentence report once more in that

25   regard and think about provisions of 18 United States Code

1   Section 3553(a).

2          It's a little hard for me to evaluate the real estate

3   holdings here, but there are a number of real estate holdings,

4   and also I guess there are 401(k) plans.

5          I would impose a fine of $400,000.  Now, I'll listen

6   to you on that subject before I finally arrive at a figure, Mr.

7   Glaser.

8          MR. GLASER:  Thank you, your Honor.  I think what

9   should also be taken into account here are the following.

10          THE COURT:  And you're entitled to have -- by the way,

11   since I've raised this, you've entitled to ask for time to

12   respond if you want to.  You don't have to go ahead this time

13   if you feel this is something that caught you unaware.

14          MR. GLASER:  I think I'm prepared to address this now,

15   your Honor.

16          As a result of any activity of criminal conduct such

17   as this, there are naturally financial consequences, which I

18   think I should make the Court aware of, and which should also

19   be taken into account.  Obviously, as a result of this conduct,

20   Mr. Peterson will never work again in his profession.

21          THE COURT:  Well, he's free to work in his profession,

22   as I see it.

23          MR. GLASER:  Well --

24          THE COURT:  Accounting.

25          MR. GLASER:  Well, two things, your Honor.  Really his

1    specialty is public company accounting.  And with a felony

2    conviction, he will never be hired.

3          And, number two, we are in discussions with the SEC,

4    and there will be a settlement in which there will be payment

5    there as well, and it is anticipated that he will agree to not

6    work in a public company.  So between the felony conviction and

7    the SEC action that's contemplated, which has already been

8    filed, effectively he will not have a source of income from his

9    chosen profession.

10          THE COURT:  Well, generally, in the civil proceedings

11    with the SEC, the people who made the -- traded on the inside

12    are the first line of payment, and so he wouldn't

13    necessarily -- since he didn't engage in it himself, he would

14    only be a secondarily liability, I would presume.  I think

15    these other people have the money to pay.

16          MR. GLASER:  I think that if I recall the downstream

17    in terms of disgorgement, which is, would be a joint and

18    several liability, he would not be required to pay.  However,

19    he will be required to pay the similar forfeiture number that

20    Mr. Levy has put on the table, as well as they are seeking a

21    penalty there as well.

22          In addition, Mr. Peterson's son has obviously been

23    involved in this conduct.  Mr. Peterson's son does not have the

24    wherewithal to make any of the required payments that he needs

25    to make, nor does he have the wherewithal to pay for his

1  attorneys fees, all of which Mr. Peterson is paying for as

2  well.  Again, I'm not asking for sympathy from your Honor, or

3  making excuses.

4           THE COURT:  I'm not asking you --

5           MR. GLASER:  I'm simply saying that in factoring in --

6  in making a determination as to what is an appropriate amount

7  to pay, I think it is important to appreciate all of the

8  ancillary costs that are being borne by Mr. Peterson here as

9  well.  And so I think those should be taken into account as

10  well.

11           THE COURT:  Well, then maybe you should give me

12  something.  It doesn't have to be -- it doesn't have to be --

13  little more, so I'd have more understanding -- another factor

14  that really made this difficult for me to arrive at a figure

15  is -- you know, I don't know what kind of a, how he lives his

16  life, put it that way, financially.  Some people like me are

17  real tight wads, and other people, you know, have much more --

18  live a life a little more elaborate, let me put it that way.

19  They're used to it.  And so it's a little hard to know

20  whether --

21           MR. GLASER:  I would --

22           THE COURT:  -- what I'm doing is really, what I am

23  contemplating doing is immensely hard on somebody or really a

24  drop in the bucket and better spent than going to the raises

25  and throwing it all away on Shank's Mare.

1          MR. GLASER:  Your Honor, I would describe Mr. Peterson

2     as not someone who is frivolous with his money.  As you can see

3     from the financials in the PSR, he lives within his means.  He

4     has zero debt.

5          THE COURT:  I know, but -- I know that.  But, you

6     know, people build -- people up in Connecticut, for instance,

7     and even what used to be a farm community where I was brought

8     up, they're building mini mansions that are worth a lot more

9     money than they broken down house --

10          MR. GLASER:  Mr. Peterson, as I understand it, lives

11     in the same house in Denver he's lived in for the past 28

12     years.

13          THE COURT:  Right, but there are other properties.

14          MR. GLASER:  Certainly there are.  But some of those

15     properties -- you know, it's a part interest in a condo in a

16     vacation spot.  So it sounds more lavish I think than one --

17          THE COURT:  Well, that's the sort of detail that I

18     thought you might want to cover in the letter, rather than --

19          MR. GLASER:  If your Honor wouldn't mind, if your

20     Honor's prepared to set forth the sentence that your Honor has

21     imposed, and let us submit an additional submission with regard

22     to an appropriate amount for a penalty, we would appreciate

23     that.  And whatever time your Honor would give us, we would

24     appreciate it, and we will abide by the Court's timing.

25          THE COURT:  Okay.  You can have -- what do you want?

1    I don't know with -- maybe it's more complicated, I mean.

2              MR. GLASER:  Two weeks, your Honor?

3              THE COURT:  Sure.

4              MR. GLASER:  Thank you, your Honor.

5              THE COURT:  Is that going to cause a problem in terms

6    of -- two weeks is the 25th.

7              THE DEPUTY CLERK:  That's when the submissions are

8    going to be in?

9              THE COURT:  Yes.

10             MR. GLASER:  Yes.  Thank you.

11             THE COURT:  Because it can be very complicated, I

12   understand that, especially in view of the obligations he's

13   undertaking at the SEC, and just, you know, the other things

14   that were referred to here, which will -- well, I guess that's

15   the sentence of the court.  Then you have -- I think I covered

16   everything.  Have I left out something?

17             MR. LEVY:  I think so, your Honor.  I, frankly, I'm

18   not certain whether or not we all have to come back and

19   actually impose sentence at that time all at once.  I don't --

20   I've never encountered --

21             THE COURT:  Do it subject to this letter, which I may

22   reduce the fine.

23             MR. LEVY:  I suppose that's right, your Honor, could

24   be contemplating --

25             THE COURT:  I thought that's what Mr. Glaser --

1          MR. LEVY:  So impose the sentence with the fine as you

2    stated it, with the possibility of it being amended,

3    essentially.

4          THE COURT:  Well, the fine I would impose would be

5    $400,000.

6          MR. LEVY:  Okay, with the possibility that it might be

7    amended.

8          THE COURT:  Subject to being, more consideration being

9    given to the matter upon receiving a letter in two weeks.

10          MR. LEVY:  Understood, your Honor.

11          THE COURT:  All right.  Well, you have two weeks to

12    file a notice of appeal of your conviction or your sentence

13    here, Mr. Peterson.  All you have to do is write a letter to

14    the Court, United States District Court, Southern District of

15    New York 500 Pearl Street, New York, New York and say I wish to

16    appeal.  That preserves your right to appeal.  But if isn't

17    received by the Court within that 14 day period, the Court of

18    Appeals will not hear your appeal, they'll say you waived it,

19    and so don't waive it if you want to appeal anything.  Just --

20          THE DEFENDANT:  I understand your Honor.  Thank you.

21          THE COURT:  All right.  I have to give that warning to

22    everyone.

23          Well, let me just say something to you.  I'm a veteran

24    also, different war, but I honor your service and it's

25    important to me.  Indeed, I think this country would be in

1   better shape if everyone had some kind of service requirement

2   to their government, because I think it would put a greater

3   sense of responsibility in our country, people in our country

4   if they had had that, and also a greater understanding of other

5   people, other people who come from different background and

6   different -- don't speak English well and do other things and

7   learning all about -- I know I learned a lot in my Army

8   service, things that my children and others haven't had the

9   advantage of because of the change in the way we approach these

10  things and -- but I also think really your service to your

11  community reflects probably the fact what I learned in the

12  Army, and your concern about other people probably rises

13  somewhat from that.  I may be wrong.  Maybe you had it all your

14  life or maybe your father on mother gave you the right

15  learning, as they say out there.

16          For many years I represented a company called

17  Panhandle Eastern Pipeline, which runs right through Kansas,

18  and also -- runs through Kansas.  And when I first started

19  representing them, I was sent to Topeka to just to have coffee

20  with Al Flander, who was still alive and used to see well

21  wishes at the coffee house in Topeka, Kansas.  And that was one

22  of the good experiences, a good experience.

23          And then to bring you back to the veteran thing

24  Senator Dole there, and of course he got wounded in World War

25  II,  his hand, he has this deformed hand that showed how

1  seriously he -- very seriously wounded.  And that was a great

2  experience.  But representing Anadarko and Panhandle, and it

3  was a learning experience for me.  And I know the kind of

4  people you grew up with because I met a lot of them out there

5  in Kansas, which is I'm sure much farther west than where you

6  came from, but still -- and you learn about the people.  And I

7  met a lot of them people who came from Kansas and nearby states

8  in the Army, so I feel I have an understanding of.  And I was

9  on the losing side trying to arrange for the election of

10  Governor Scranton from Pennsylvania when Barry Goldwater got

11  the nomination, and saw the events that took place at the

12  Palace and different -- it was clear that all the things I

13  learned in the Army still applied to most of the people,

14  outlooks, and so Army experience did me well -- although we

15  lost, but we lost for a couple of reasons that I won't go into,

16  but makes for an interesting story.

17          Now I want to say on the alcohol, I'm older than you

18  are, but I can tell you I used to, when I was in the Army I

19  drank, and I particularly drank between serving one tour and

20  second tour abroad, and by -- right after I got back, because I

21  thought I lost my crew and they were all dead, and it's just

22  like when you're 19, 20, it's quite a blow.  So -- and people

23  used to drink, 30's, 40's, the 50's hard alcohol always and be

24  a hung over from that.  Times have changed here, but as you get

25  older, you can't handle it.  You just can't.  It doesn't take

1  much to affect your balance and things like that.  So you don't

2  drink.  And just, if you have a problem -- I think you probably

3  did -- no one ever recognizes that they have a problem.  That's

4  why alcoholics anonymous, one of the tenants.  And so don't --

5  whatever do you on your future, don't go back to the drinking.

6  That's my only suggestion.  And I'm probably wrong with --

7  there are probably exceptions to the rule, but not worth

8  ruining your life and ruining the love that your family has for

9  you.  Because dealing with an alcoholic is -- if you get that

10  way is a very difficult thing.  I know too many marriages that

11  have been ruined by alcoholism and relationships with kids that

12  have been ruined by alcoholism, and it just a big mistake.  But

13  I don't think that your grandchild would have been left with

14  you if you were still an alcoholic, so.  And I'm sure your

15  daughter had confidence that you weren't going to go on

16  drinking yourself blind when you have the day with your child

17  all these times.  So I don't think it's going to come back.

18  But I feel obliged to just say, be sure you don't get into

19  that, because that's what -- that's disrespecting yourself.  I

20  have these -- I've had people before me come in from very poor

21  backgrounds, and the other day one came in, and I had a lot of

22  trouble getting him on the straight and narrow, he keeps doing

23  stupid things.  And he said, you know, Judge, I finally got it,

24  I've been disrespecting myself.  And I haven't heard from him

25  since.  He's been fine, no problems at all, once he realized

1    that by his conduct, which is substance abuse he'd been

2    disrespecting himself.  And when I say the other day, it was

3    about a year ago.  That's pretty good.

4         Things out there in Colorado, I had a great -- I had a

5    lawyer out in Colorado, friend of -- God parent of one of my

6    children and he was called A.J., and he came from Colorado

7    Springs, and he was the legal aid lawyer of the year in

8    Colorado for several years there, in fact ten years ago or so.

9         Thank you very much, and I wish you luck.  I think

10   you've got the right motivations.  And I believe your family

11   should be proud of you, they shouldn't disrespect -- and other

12   people should be proud of.  You've made a mistake here, you've

13   been penalized, you're going to take your medicine and move on

14   I often put in sentences -- Robert, I better, if he has

15   supervised release, I want some community service in the first

16   year, 50 hours, something like that.  That's not as a penalty.

17   That's to make sure you continue it, because you'll get respect

18   that way and you'll get self respect that way.  Because people

19   will appreciate everything you do and that's what people need

20   is respect for themselves.  And that was something I learned --

21   I won't go into the story, but I could tell it to you sometime,

22   I tell it to other people, not in this case.

23         So I guess that's the sentence of the Court.  Good

24   luck to you.  May God bless you and your family.

25         THE DEFENDANT:  Thank you your Honor.

1abzpets                    Sentence

1              MR. LEVY:  Thank you, your Honor.

2              MS. APPS:  Thank you, your Honor.

3              MR. GLASER:  Thank you, your Honor.

4              (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 20

August 5, 2016

Your Honor,

I have no hesitation in writing you a reference letter for my friend John Simonlacaj. He has a reputation of being a just man with strong integrity so learning of the charge of tax fraud against him came as a surprise. While I hold no connection to the trial, to you judge, nor your influence on the case, I feel that you should know that John is more than just his crime. He is he truly is a fine man of character.

I have known of John almost all of my life from mostly from afar. He and his family's notoriety comes from their very active role within the Albanian community in New York specifically as integral members and contributors to our church, Our Lady of Shkodra, in Hartsdale. John grew up volunteering in the church's youth group, dancing at concerts, organizing fundraisers and supporting whatever cause the church calls for. I developed a friendship with John in the last 15 years through our wives who are very close friends. One thing that you learn quite quickly about John is that he holds a high standard of integrity, a strong moral compass, and most notably, an unshakeable devotion to his family. A dedicated husband to his wife of twenty two years, Drita, their son ▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ ) and daughters, ▮▮▮ (boisterous daddy's girl) and ▮▮▮ ▮▮▮▮▮▮ ▮▮▮ are always at the forefront of John's love and attention. Not forgetting his support and care for his aging parents who live with him. He's a model son, husband, father and an American patriot. God, country, family - these are the tenets which John espouses.

Altruistic John he lends himself selflessly to anyone in need. Just ask the several dozen friends who made him their Best Man at their weddings, Godfather to their children, aided in getting jobs, helped become US Citizens, donations to the church, the list goes on. When my wife and I lost our parents only a month apart, John made sure to check in regularly, visit, or lend his time during our grief. It is a testament to his selfless contribution to others. It's genuine. And that is what makes John's integrity so admirable.

The nature of the offence is out of character for the person I know. There has never been a moment that I have had any doubt of John's integrity and morals. John is a kind, considerate, honest and reliable man. I have no doubt that that he will never be involved in anything like this again.

Men are most certainly fallible beings. Everyone at some point loses their way. I ask that you consider who John is and the impact his absence will have on those who rely so much on him.

Sincerely,

Viktor Zagreda

Viktor Zagreda

Mount Kisco, New York ▮▮▮

# EXHIBIT 21

July 25, 2016

To Judge Vincent Briccetti,

I am writing in reference to John Simonlacaj, who is being sentenced. I have known John for 20 years, we are very good friends. I believe that I am in position to speak to John's moral character.

John is, in short, a good person. He has always been kind and generous with others. He has a strong sense of duty, which implies to his family, community, and job. He also possesses a great deal of integrity, and constantly strives to make sure he is doing the right thing. Anytime I needed help, whether it be working on my house or car John was always there without hesitation.

It must be difficult for you to make decisions like this when you don't actually know the person standing in front of you. I hope you will take this letter and countless others you are receiving, into account when making your decision and understand that John is the kind of person people rally around. That has to say something, so let that please be a factor in your decision.

Thank you,

Thomas J. Foley
Thomas J Foley

# EXHIBIT 22

March 1, 2016

      RE:  Letter of Reference for John Simonlacaj

Your Honor:

My name is James Halpin, ███████████████████████████ █████████.  I am a
long time friend/colleague of John Simonlacaj of ████████████ knowing him both on a
professional , business and charitable level.

I can confirm that he is a man of great integrity and is extremely dedicated to his family and
work.  On numerous occasions he has gone above and beyond to support his co-workers and
friends.  John's continuous effort in helping the community and charitable organizations is a
direct reflection of his core values.  He regularly puts the needs of others before his own and has
volunteered his time to raise awareness to many notable causes.

I respectfully ask that any consideration be given to him for the good person he is, and his
dedication to the betterment of the community.

Best Regards,

**James Halpin**

# EXHIBIT 23

The Honorable Vincent Briccetti,

I am contacting you about John Simonlacaj, who is being sentenced in one of your upcoming court cases. I am reaching out to you because John has not only been a long-time friend of my family, but he is also an extraordinary man with an abundance of positive qualities.

Our family met John 18 years ago through a mutual friend. He has been nothing but honest, sincere, and sweet with us from day one. We have always depended on him any time we needed help, and he would do anything for anyone. However, the most important thing in John's life is undoubtedly his wife Drita, his children, ███ 17, █ 12 and ███ 5. He would do anything for his family and he is a great influence on their lives. I being a wife and mother, feel that John being away from his family and community for any amount of time would be a great loss for everyone.

I hope you consider this information in regards to the charges John is facing. Thank you for taking the time to hear my thoughts on this matter.

Sincerely,

Carmela Landro

# EXHIBIT 24

Kathy Rohan
██████████████
Valley Cottage, NY ████

July 28, 2016

The Honorable Vincent Briccetti
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, NY 10601-4150

Dear Honorable Briccetti:

I am writing to you in reference to John Simonlacaj, who is being sentenced in one of your upcoming court cases. John is a generous and kind person. He is a trustworthy and caring friend who is also helpful.

John is the type of person that you can count on and know he would do anything for anyone. I've known him for fifteen years and consider him a good friend.

I hope you consider this information in regards to the charges John is facing. Anytime away from his family and community, I believe, would be a disservice to all.

Thank you for taking the time to read my letter.

Regards,

Kathy Rohan